**BAXTER TRAVENOL LABORATORIES, INC. et al., Plaintiffs,**

v.

**William E. LEMAY et al., Defendants.**

No. C–3–80–362.

United States District Court,
S. D. Ohio, W. D.

Feb. 19, 1981.

Jon M. Sebaly, Smith & Schnacke, Dayton, Ohio, for defendants.

G. David Schiering, and Murray S. Monroe, Cincinnati, Ohio, Roger F. Lewis, Deerfield, Ill., for plaintiffs.

Jerome B. Pederson, Minneapolis, Minn., for Despatch Industries.

DECISION AND ENTRY ON MOTIONS; DEFENDANTS' MOTION, SEEKING TO COMPEL WARNICK TO ANSWER CERTAIN QUESTIONS ON ORAL DEPOSITION, OVERRULED; PLAINTIFFS' AND WARNICK'S MOTION, SEEKING ORDER OF COURT QUASHING OR STAYING A DEPOSITION SUBPOENA SERVED UPON WARNICK, DEEMED MOOT; DEFENDANTS' MOTION, SEEKING AWARD OF EXPENSES IN OPPOSING MOTION TO QUASH OR STAY SUBPOENA, OVERRULED

RICE, District Judge.

The captioned cause came to be heard upon three motions, to wit:

(1) the Defendants' motion seeking an Order of the Court compelling David Warnick to answer certain questions on oral deposition;

(2) the Plaintiffs' and Warnick's motion seeking an Order of the Court quashing or staying a deposition subpoena served

upon Warnick by Defendants after the preceding motion was filed; and

(3) the Defendants' motion seeking an Order of the Court awarding the expenses of opposing Plaintiffs' and Warnick's motion to quash or stay the Warnick subpoena.

The claims, counterclaims, and defenses of the respective parties are extensively set forth in this Court's Decision and Entry of October 28, 1980. In essence, Plaintiffs claim that the Defendants have breached their employment contracts with Plaintiffs, violated fiduciary duties to Plaintiffs, wrongfully appropriated Plaintiffs' confidential and proprietary information in the establishment and operation of a competing enterprise, and that the Defendants fraudulently induced and then breached a "settlement agreement" with Plaintiffs, which agreement terminated prior litigation between the parties. Defendants claim that Plaintiffs have attempted, and are continuing to attempt, to monopolize or restrain trade.

By way of additional background, particularly relevant to the motions presently under consideration, it appears that David Warnick is a former associate of the Defendants, having previously been an employee of the Plaintiffs (i. e., before 1978) and shareholder, officer, and participant in the competing corporation formed by Defendants (in 1978). Warnick was a defendant in the prior litigation commenced by Plaintiffs (said litigation having been terminated by the "settlement agreement") but is not a party to this instant action.

It further appears that Warnick's association with the Defendants was terminated in February, 1980. Shortly thereafter, Warnick contacted Plaintiffs' in-house counsel in an attempt to sell Warnick's stock in the Defendants' corporation. Although this offer was refused, Plaintiffs' counsel asked if Warnick would be interested in a "renewed" investigation of Defendants' use of Plaintiffs' property in the establishment and operation of the competing corporation. After a period of negotiation, Plaintiffs employed Warnick as a "litigation consultant" to assist in the investigation which culminated in the present litigation.

In September, 1980, Defendants undertook to depose Warnick regarding his performance and compensation as a "litigation consultant" for Plaintiffs. Plaintiffs' counsel, who had also become Warnick's counsel shortly before the time of the deposition, allowed free inquiry by Defendants into Warnick's conduct up to the time of the consulting agreement, on May 1, 1980. However, Warnick was instructed not to answer any questions "with respect to activities pursuant to [the consulting] agreement," on grounds that such activities were protected work product. Subsequent colloquy by counsel during the course of the deposition, and memoranda submitted on the present motions, have limited Plaintiffs' objection only to inquiry about the "substance of conversations" Warnick had with Plaintiffs' in-house or outside counsel after May 1, 1980. Plaintiffs interpose no objection to the production of any subpoenaed document in Warnick's possession, or to interrogation on the compensation for or terms of Warnick's consulting activities. However, Plaintiffs now also assert attorney-client privilege, in addition to work product, as a basis for precluding inquiry into Warnick's conversations with Plaintiffs' counsel.

Plaintiffs' objection on grounds of attorney-client privilege is well taken. The privilege asserted in this case is, of course, not Warnick's since none of the attorneys with whom Warnick had the subject conversations became Warnick's counsel until after the conversations had taken place. Rather, the privilege asserted, herein, if it exists, belongs to the corporate Plaintiffs since one or the other or both of them, is the "person" who employed counsel with whom Warnick conversed. (For the sake of brevity, Plaintiffs have been, and will be referred to, hereinafter, collectively in the plural.)

Until recently, the Sixth Circuit followed the "control group" test in determining the scope of the attorney-client privilege in the corporate context. *United States v. Upjohn Company*, 600 F.2d 1223 (6th Cir. 1979),

rev'd., —— U.S. ——, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). Under the "control group" test, the attorney-client privilege covered communications made to corporate counsel by "those officers, usually top management, who play a substantial role in deciding and directing the corporation's response to the legal advice given." *Id.* at 1226. Communications made to counsel by subordinate corporate agents would also be privileged, but only when made at the direction of a control group member, and only when consisting of matters known to the control group member. *Cf. id.* at 1227 n.11.

As Plaintiffs point out, a broader "subject matter" test for corporate attorney-client privilege has been preferred over the "control group" test in other Circuits. *See, e. g., Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 606–617 (8th Cir. 1978) (on rehearing en banc). Under the "subject matter" test, the privilege extends to communications by subordinate agents to corporate counsel upon the request of a superior, so that the corporation might secure legal advice, if the subject matter of the communications is within the scope of the agent's duties as an employee. Thus, the "subject matter" test differs from the "control group" test in protecting communications with counsel according to their content, rather than according to the status of the person who makes such communications or causes them to be made.

During the pendency of Defendants' motion, herein, the Supreme Court overruled the "control group" test. *Upjohn Company v. United States,* —— U.S. ——, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), *rev'g.* 600 F.2d 1223 (6th Cir. 1979). However, in taking such action, the Court did not establish the "subject matter" test as the standard by which the scope of corporate attorney-client privileges would be measured:

> With respect to the privilege question, the parties and various *amici* have described our task as one of choosing be-

tween two "tests" which have gained adherents in the courts of appeals. We are acutely aware, however, that we sit to decide concrete cases and not abstract propositions of law. We decline to lay down a broad rule or series of rules to govern all conceivable future questions in this area, even were we able to do so. *Id.* at ——, 101 S.Ct. at 681. Indeed, even though the Opinion of the Court extensively criticizes the "control group" test on grounds that it is uncertain and difficult to apply, *id.* at ——, 101 S.Ct. at 684 [1], one searches the Court's Opinion in vain for some substituted guideline which might enhance the predictability of the privilege, over that which had been available under the admittedly rough standard of the "control group" test. *Cf. id.* at ——, 101 S.Ct. at 689 (Burger, C. J., concurring).

Fortunately, the operative factors in *Upjohn* — i. e., those considerations upon which the Supreme Court expressly found warranted the conclusion that the attorney-client privilege extended to communications from Upjohn's lower-echelon employees to Upjohn's counsel, *id.* at ——, 101 S.Ct. at 689 — are, for the most part, also found in the present case. This Court views those factors as follows:

(1) The communications at issue, herein, were made to Plaintiffs' counsel, acting as such, by Plaintiffs' employee, Warnick;

(2) The communications were made at the direction of Warnick's corporate superiors pursuant to the litigation consulting agreement;

(3) The communications were made so that Plaintiffs counsel might determine the nature and extent of Plaintiffs' legal rights, and so that Plaintiffs might secure legal advice with respect to those rights;

(4) The answers to the inquiries which produced the communications were not previously known to Plaintiffs' "upper-echelon management" but, nonetheless,

---

**1.** "[I]f the purpose of the attorney-client privilege is to be served, the attorney and client must be able to predict with some degree of certainty whether particular discussions will be protected. An uncertain privilege, or one

which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all." *Id.* at ——, 101 S.Ct. at 684.

answers to such inquiries were needed to supply a basis for legal advice concerning Plaintiffs' legal rights (including the possibility of litigation);

(5) Plaintiffs, Plaintiffs' counsel, and Warnick were aware of the legal implications of the communications when made, particularly with respect to potential litigation; and

(6) Plaintiffs, Plaintiffs' counsel, and Warnick considered the communications confidential when made and they have been kept confidential since that time.

The Court acknowledges that one factor considered in *Upjohn* ___ i. e., that the communications concerned matters within the scope of the employees' corporate duties ___ is probably not operative with respect to the communications at issue in the present case. Warnick, who had only been Plaintiffs' "employee" since May 1, 1980, presumably did not communicate with Plaintiffs' counsel about his activities as Plaintiffs' employee, but only about matters occurring during his prior association with the Defendants. In other words, although it was clearly within the scope of Warnick's duties as Plaintiffs' employee to communicate with counsel, the matters about which he communicated had nothing to do with the course of his association with Plaintiffs.

■ Nonetheless, this Court concludes that the presence of that factor in *Upjohn* and its absence, herein, is not significant under the totality of the circumstances in this case. *Upjohn* teaches that it is the *process* of uninhibited client communication in securing legal advice which is deserving of the privilege's protection, *id.* at ——, 101 S.Ct. at 684, and that emphasis on either the *status* of the communicator (under the "control group" test) *or* the *content* of the communication (under the "subject matter" test) would be misplaced. Therefore, the privilege's protection should not be made to depend upon the content of the communication, or the context in which (or status of the person by whom) such content was originally developed. That is, the communication should be protected even if the information, therein, was originally obtained be-

fore the communicator became the corporate client's employee, as long as the communication is made by the client's employee, *qua employee*, at the client's behest, in order to secure legal advice, and such communication is intended by the client and participants to be confidential.

■ By rough analogy to the scope of the individual (i. e., noncorporate) attorney-client privilege, it might be noted that the privilege is ordinarily not abolished simply because the individual client speaks solely of matters about which he does not have firsthand knowledge (i. e., information which was not developed by the client, but by another individual). A corporate client is not in a significantly different situation. The privilege should not be denied simply because the corporation must act, obtain knowledge, and communicate with counsel through other, natural "persons." The privilege should apply herein even if the corporate client's employee (Warnick) communicates certain information to counsel, which was not developed by either the corporate client or its employee, while in the employ of the corporation, but rather by that employee *before* his association with the corporate client.

For the forestated reasons, the Court concludes that compelled disclosure by Warnick of the "substance of conversations" had with Plaintiffs' counsel after May 1, 1980, pursuant to the "litigation consultant" agreement would require disclosure of communications protected by the attorney-client privilege. Therefore, Defendants' motion seeking an Order of the Court compelling Warnick to answer questions in that area of inquiry is not well taken and is overruled.

In so ruling, the Court finds that it need not reach the question whether the "substance of conversations" between Plaintiffs' counsel and Warnick are simultaneously protected from compelled disclosure by virtue of the "work product" doctrine enunciated in *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947). However, the Court does note that one of the limitations which *Plaintiffs* would have agreed

upon, in defining the boundaries of "work product" protection, is equally applicable in defining limitations upon the scope of the attorney-client privilege. That is, in acknowledging that the work product doctrine would not preclude the deposition of Warnick about his knowledge of relevant facts, Plaintiffs said in a memorandum:

> Defendants' questions addressed to Mr. Warnick in this case went far beyond mere discovery of facts. These questions sought to discover the substance of conversations with counsel.

While it is absolutely clear that, in continuing the Warnick deposition, Defendants also may not seek to discover the "substance of conversations" with counsel because of the attorney-client privilege, it should be equally clear that this is the only limitation on the scope of inquiry that is presently warranted. This Court notes, as did the Supreme Court in *Upjohn, supra,* that because it is the communication *process* rather than the communication's *content* which deserves protection:

> [t]he privilege only protects disclosure of communications; it does not protect disclosure of underlying facts by those who communicated with the attorney . . .

*Id.* at ——, 101 S.Ct. at 689.

To paraphrase the opinion in *City of Philadelphia v. Westinghouse Electric Corp.,* 205 F.Supp. 830, 831 (E.D.Pa.1962), Warnick, as Plaintiffs' employee, cannot be compelled to answer the question, "What did you say to Plaintiffs' attorney?" But Warnick may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to Plaintiffs' attorney.

Finally, it is noted that Defendants' contend, with respect to the work product doctrine, that any work product protection applicable to this case should be superceded by Defendants' *need to discover the subject conversations* as evidence of Plaintiffs' illegal, anticompetitive conduct in prosecuting this lawsuit. To the extent that similar considerations are known at common law as sufficient reason for nonrecognition of the attorney-client privilege (e. g., where the consultation is, itself, in issue as an illegal act in furtherance of a conspiracy), the Court notes that the Defendants must establish a prima facie case of such illegality *before* the privilege may be avoided. *Cf. Clark v. United States,* 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933); *McCormick on Evidence,* § 95 at 200 (2d ed. 1972). Defendants have not previously carried this burden (see this Court's *Decision and Entry* of October 28, 1980 at 6) and have yet to do so.

After the dispute arose concerning application of the work product doctrine during the first two days of Warnick's deposition, Defendants attempted to arrange for additional deposition dates through Warnick's counsel (formerly only Plaintiffs' counsel). Warnick's counsel refused, maintaining that "[i]t would be a waste of time" to continue the deposition without benefit of this Court's ruling on the proper scope of the deposition. On October 6, 1980, four days after the Defendants' motion to compel discovery was filed, Defendants caused a deposition subpoena ad testificandum to be served on Warnick.

Shortly before the deposition date set forth in the subpoena, Plaintiffs and Warnick joined in a motion to "quash or stay" the subpoena. In a memorandum accompanying the motion, it was made clear that movants were not seeking to preclude further deposition of Warnick, but only sought to "*forestall* the deposition" pending this Court's determination of the proper scope of inquiry. Defendants opposed the motion (and moved for sanctions in the form of an award of the expense of such opposition) for the reason that movants' opposition to the subpoena was based on speculation regarding the subject matter about which Defendants contemplated further interrogating Warnick.

■ As Defendants point out, there is no provision in F.R.C.P. 45 for quashing or staying a subpoena *ad testificandum* (reference to F.R.C.P. 26(c) in F.R.C.P. 45(d)(1) being applicable only to a subpoena *duces tecum* ). However, when construed as a

request for extension of the deposition date set forth in the subpoena, Plaintiffs' motion may be properly understood as an appeal to this Court's power under F.R.C.P. 30(b)(3). *See* 9 Wright & Miller, *Federal Practice and Procedure*, § 2453 (1971). An award of the expense of opposing discovery motions, otherwise available under F.R.C.P. 37(a)(4) *is not authorized for successful opposition to a motion under F.R.C.P. 30(b)(3).* *See* 8 Wright & Miller, *Federal Practice and Procedure*, § 2288 at 787 n. 39. Thus, even if the motion to "quash or stay" the subpoena were determined to be without merit, Defendants would not be entitled to an award of the expense of opposing same.

Further, because Defendants would in no event be entitled to an award of the expense of opposing the motion, and because Plaintiffs' and Warnick's reasons for filing the motion are clearly *no longer* viable (i. e., movants have effectively obtained the extension they sought, and the question regarding the proper scope of the deposition has been answered), this Court need not now determine whether the motion was meritorious when filed. The motion is moot.

For the forestated reasons, the Court declines to enter a decision on the motion by Plaintiffs and Warnick seeking an Order of the Court quashing or staying the deposition subpoena served upon Warnick. Defendants' motion seeking an Order of the Court awarding the expense of opposing Plaintiffs' and Warnick's motion is not well taken and is, therefore, overruled, for the reason that Defendants would not be entitled to such award whether or not they would have been successful in opposing Plaintiffs' and Warnick's motion.

To summarize:

(1) Defendants' motion seeking an Order of the Court, compelling David Warnick to answer certain questions on oral deposition, is overruled;

(2) Plaintiffs' and Warnick's motion seeking an Order of the Court quashing or staying the deposition subpoena served on Warnick is moot, and no decision will be entered thereon; and

(3) Defendants' motion seeking an Order of the Court awarding the expenses of opposing the motion to quash or stay the Warnick subpoena is overruled.

FURTHER DECISION AND ENTRY ON MOTIONS; MOTION TO ADMIT LEWIS SUSTAINED; PLAINTIFFS' MOTION SEEKING EXPENSES IN OBTAINING ORDER OF COURT OVERRULED; NO DECISION MADE ON MOTION TO REJECT MINNESOTA MAGISTRATE'S REPORT; DEFENDANTS' MOTION FOR PROTECTIVE ORDER OVERRULED IN PART AND SUSTAINED IN PART; STATUS AND DISCOVERY CONFERENCE SET

The captioned cause came to be heard upon four motions, to wit:

(1) The Plaintiffs' oral motion seeking the admission pro hac vice of Roger Lewis, who is also General Counsel (i. e., "in-house" counsel) for Plaintiff Baxter Travenol;

(2) Plaintiffs' motion seeking an Order of the Court awarding the expenses incurred in obtaining the Order issued by this Court on October 28, 1980 (directing the Defendant Phoenix to permit entry and inspection at its South Carolina facility);

(3) Plaintiffs' motion seeking an Order of the Court "rejecting" the decision of a Minnesota Magistrate that certain documents owned by the nonparty Despatch Industries, Inc., not be copied, and, in addition, compelling Despatch to permit such copying; and

(4) Defendants' motion seeking an Order of the Court protecting against broad disclosure of "confidential" information exchanged between the parties during the course of discovery.

A. *THE ADMISSION OF LEWIS*

■ There being no appropriate reason presented by Defendants why Lewis' admission pro hac vice should not be allowed, Plaintiffs' motion seeking an Order of Court permitting said admission is well tak-

en and sustained. Defendants' contention that Lewis has been, and continues to be, a major participant in Plaintiffs' alleged anticompetitive conduct (including the prosecution of the instant lawsuit), by virtue of his position as Plaintiffs' in-house counsel, is simply not relevant to the limited question of eligibility for admission under S.D.Ohio R. 3.0.4. To the extent that Lewis' activities in his position with the Plaintiff corporations (i. e., as in-house counsel) may present problems regarding the confidentiality of any of Defendants' "trade secrets", which may be discovered in the course of this litigation, such problems would be a result of Lewis' access to and conduct concerning that information, and not because this Court allows him to appear for this cause. Restrictions on Lewis' access or conduct with respect to discovered materials, upon his admission, herein, are questions properly reserved for consideration with Defendants' motion for a protective order, *infra.* Further, the possibility that Lewis may become a witness in this case (again, because of his activities as in-house counsel) is also irrelevant to the limited question of admission. However, for Defendants' benefit rather than because of any perceived need to advise Lewis, this Court would remind Lewis of his ethical obligations under Canon 5 of the ABA Code of Professional Responsibility (*see* Ethical Considerations 5–9, 5–10; Disciplinary Rules 5–101, 5–102; S.D.Ohio R. 2.4.7), and of this Court's continuing authority to withdraw permission to appear under S.D.Ohio R. 3.0.4.

### B. *PLAINTIFFS' MOTION SEEKING EXPENSES*

 Based solely upon the difficulty of the significant legal questions presented by the motion which resulted in this Court's Order of October 28, 1980, there would be no question that Plaintiffs are *not* entitled to an award of the expense of obtaining that Order, pursuant to F.R.C.P. 37(a)(4). Simply stated, Phoenix's opposition to entry and inspection was not the kind of captious or frivolous conduct upon which such an award might be based. But there is an additional reason why an expense award is *particularly* inappropriate in this case. The Court notes that Phoenix's motion for a protective order, associated with Plaintiffs' request for entry and inspection, was also sustained and included as part of the October 28 Order. In sustaining Phoenix's motion, this Court recognized the possibility of adverse interference with Phoenix's production capabilities, and the possibility of compromised confidentiality about Phoenix's production processes, through entry and inspection. That the Court found these threats of injury existed in sufficient degree to warrant bonding and other protective measures, as specified in the Order, should indicate to Plaintiffs that the Court did not, and does not, consider Phoenix's opposition to entry and inspection to be without substantial justification, albeit not well taken in its entirety.

For the aforestated reasons, Plaintiffs' motion seeking an Order of the Court awarding the expenses incurred in obtaining the Order issued by this Court on October 28, 1980, is not well taken and is, therefore, overruled.

### C. *PLAINTIFFS' MOTION SEEKING REJECTION OF DECISION OF MINNESOTA MAGISTRATE*

In September, 1980, Plaintiffs caused deposition subpoenae, duces tecum, to issue from the Federal District Court in Minnesota to a nonparty, Despatch Industries, Inc., pursuant to F.R.C.P. 30(a)–(b), 45(d). Prior to the date set for deposition, Despatch advised Plaintiffs that it would produce for inspection certain subpoenaed documents (i. e., blueprints which Despatch had used in manufacturing Phoenix's production equipment), but that Despatch objected to any copying of said documents by Plaintiffs, on grounds that the documents are proprietory and confidential.

During the course of the depositions, a hearing was arranged before Magistrate Cudd of the Federal District Court in Minnesota in order to obtain a determination whether Despatch should be required to

permit copying of the documents. The Magistrate ruled that Plaintiffs did not demonstrate the "relevancy" of the documents sufficient to support an order compelling Despatch to permit them to be copied. But in declining to issue such order, the Magistrate stated:

> Some additional discovery may well demonstrate the relevancy. Accordingly, the motion has been denied at this time without prejudice to plaintiffs to renew it *in the court in which the action is pending* or this court. (Emphasis added)

Plaintiffs have "renewed" the motion, herein (styled as a Motion to Reject the Findings and Decision of the Magistrate and to Order Inspection and Copying of Certain Documents), contending that: (1) the documents are relevant as discovery requests directed to Defendants' alleged misconduct in employing Plaintiffs' trade secrets, which had been wrongfully appropriated, in Phoenix' production processes; (2) Plaintiffs are entitled to inspect *and copy* relevant subpoenaed documents under F.R.C.P. 45(d)(1); and (3) the confidentiality of the documents is no reason to preclude copying, since Plaintiffs and Despatch are not competitors, and the potential for unnecessary disclosures to Despatch's competitors can be avoided by an appropriate protective order.

Defendants oppose Plaintiffs' motion contending that the documents are by nature irrelevant (i. e., since the documents are "proprietary" to Despatch, they cannot contain information "proprietary" to Plaintiffs which could have been misappropriated). Plaintiffs say that Defendants lack standing to oppose enforcement of a subpoena directed to a nonparty.

█ The Court declines to enter a decision on Plaintiffs' motion for the reason that it lacks authority to do so under the Civil Rules, despite the suggestion in Magistrate Cudd's Order that it might nonetheless be done. Although reference is made to S.D.Ohio R. 3.8.4 and F.R.C.P. 30(d) in Plaintiffs' motion and accompanying memorandum, said motion *by Plaintiffs* clearly does not seek to "terminate or limit examination" in a deposition. Similarly, said motion *by Plaintiffs* does not seek a protective order pursuant to F.R.C.P. 26(c). On the contrary, Plaintiffs' motion seeks this Court's aid in *compelling* certain conduct by a *nonparty* deponent *subpoenaed* by process of a *federal court in a different district*, either pursuant to F.R.C.P. 37(a) or 45(d)(1).

F.R.C.P. 37(a)(1) provides in pertinent part:

> An application for an order to a deponent who is not a party shall be made to *the court in the district where the deposition is being taken* [which in this case, as in most, is the court from which the subpoena issued].

F.R.C.P. 45(d)(1) provides in pertinent part:

> The person to whom the subpoena is directed may . . . serve . . . written objection to . . . copying of any or all of the designated materials. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials except pursuant to an order of *the court from which the subpoena was issued.*

The import of these rules is clear. It would be improper for this Court to attempt to enforce a subpoena issued by a different district court against a person who is not a party to the action pending herein. Since this Court lacks the authority to enforce such a subpoena, it would be futile for the Court to entertain a motion seeking such action (and, thereupon, proceed to render an advisory opinion for the benefit of the Court by whose process the subpoena must in most circumstances be enforced).

Although Despatch's counsel did participate in oral argument on Plaintiffs' motion, and it might be contended that Despatch thereby waived objection regarding this Court's lack of authority to control Despatch's conduct, the Court considers that Despatch effectively preserved such objection (and, indeed, presented same to this Court) by contesting the Court's authority to enter into a review of Magistrate Cudd's Order at that time.

For the aforestated reasons, this Court declines to enter a decision on Plaintiffs' motion seeking an Order of the Court rejecting the decision of the Minnesota Magistrate and compelling Despatch to permit copying of subpoenaed documents, said motion having been improvidently filed in the wrong court.

## D. *DEFENDANTS' MOTION FOR A PROTECTIVE ORDER*

Defendants' motion for a protective order seeks the Court's guidance with respect to one provision of a broader protective order which the parties are negotiating for stipulation. The parties are in agreement that certain "confidential" information produced in the course of discovery should be "restricted." Plaintiffs have proposed that disclosure of "restricted-confidential" information not be made to persons other than "the attorneys for the parties, their associates and employees, independent experts and their staffs (and other persons agreed upon from time to time)". Defendants seek to further limit such information against disclosure to Plaintiffs' "in-house" counsel and staff (i. e., that disclosure only be permitted to "Plaintiffs' *independent* counsel, experts and *their* staff").

Primarily, Defendants seek such further limitation because one of Plaintiffs' "in-house" counsel, Roger Lewis, is alleged to be a major participant in Plaintiffs' anti-competitive conduct. Access to sensitive information by Lewis and his staff would subject said information to further anticompetitive abuse by Plaintiffs, through the potential for effective disclosure to Plaintiffs by Lewis' utilization of the information in his position as "in-house" counsel.

Upon review of the authorities cited by counsel for both sides, it appears clear that Plaintiffs are entitled to have the kind of information at issue disclosed to "trial counsel" ___ "trial counsel" being defined as attorneys charged with the responsibility for and actively engaged in preparation and litigation of the case ___ because of the necessity of access to such information in the course of trial counsel's preparation of

the matter. *Triangle Ink & Color Co., Inc. v. Sherwin-Williams Co.*, 61 F.R.D. 634 (N.D.Ill.1974). On the other hand, it also appears clear that Defendants are entitled to protection against disclosure of said information to "in-house counsel" ___ "in-house counsel" being defined as attorneys in the regular employ of a corporate party ___ because of the potential for abuse of such information through use in the ordinary course of in-house counsel's performance for the corporation. *Scovill Manufacturing Company v. Sunbeam Corporation*, 61 F.R.D. 598, 602 (D.Del.1973).

However, none of the cases cited by the parties specifically address the situation, presented herein, concerning the propriety of disclosure of confidential information to a "trial attorney" who is also "in-house counsel" (i. e., Lewis). As noted above, this question does not arise because Lewis has been admitted for the cause (i. e., *permitted* to appear and participate), but because of his access to and conduct concerning confidential information upon admission (i. e., *the proper extent* of his appearance and participation, particularly in discovery). Because of Lewis' dual role, in the litigation of Plaintiffs' cause, and in the performance of his duties with respect to Plaintiffs' regular business operations, a conflict between Plaintiffs' qualified right to preparation of the case by counsel of their choosing, and the potential for abuse of that right by virtue of Plaintiffs' choice of in-house counsel, would *appear to be* squarely presented.

Ordinarily, the Court might determine that a qualified right should give way in the face to a potential for injurious abuse. However, the Court does not view the instant situation as precisely presenting that *apparent* conflict.

It must be noted that the concern, herein, is not with the person involved, or with formal designations for that person's various roles. Rather, the essential concern is with different kinds of conduct (i. e., proper use of confidential information for Plaintiffs' litigation versus improper use for Plaintiffs' regular business purposes). A conflict occurs only if a person performs

roles requiring, respectively, each kind of conduct and, further, *only if that person cannot be expected to differentiate his conduct in performing each role.* In other words, the precise question in this case is whether Lewis can be expected to use confidential matters obtained in his role as "trial counsel" only in the prosecution of this litigation, and not use such information for the corporations' "other" purposes in his role as "in-house counsel."

It does not answer that question to say, as Defendants do, that because Lewis participated in Plaintiffs' instigation of this lawsuit for allegedly anticompetitive corporate purposes, that *Lewis' use* of the information for this litigation is indistinguishable from improper use for "other" corporate purposes. Such a contention does not merely require nondisclosure to Lewis, but absolute nondisclosure[2] in this litigation (i. e., to any of Plaintiffs' counsel), because the contention presupposes that this litigation, itself, is the "other" corporate use of confidential information. Under that approach, it would provide no benefit to Defendants to only preclude disclosure to Lewis or other "in-house" counsel: the alleged anticompetitive litigation would still continue *with the use of confidential information* after its disclosure to "trial counsel" other than Lewis. In a sense, according to Defendants' scenario, *all of Plaintiffs' "trial counsel"* would effectively be acting as "in-house counsel," in serving anticompetitive corporate purposes by prosecuting this lawsuit.

This Court concludes that there is no insurmountable difficulty in Lewis' differentiation between the proper uses of confidential information disclosed to him as "trial counsel" in preparing for this litigation and its improper uses in his role as "in-house counsel" in serving Plaintiffs' regular business purposes. Moreover, this Court finds no reason to question the reasonable expectation that Lewis will conform his uses of such information to that differentiation, pursuant to that portion of Plaintiffs' proposed protective order which describes permitted uses of "restricted-confidential" information consistent with the preceding discussion.

It follows from the aforestated principles that access to "restricted-confidential" information by members of Lewis' corporate legal staff should also not be foreclosed *to the extent* any such staff member is charged with the responsibility for and is actively engaged in the preparation of Plaintiffs' cause, herein, *and, further, to the extent* that each such staff member can be expected not to use, and will not use said information in the ordinary course of his performance while serving Plaintiffs' regular business purposes.

However, the Court cannot conclude, at this time, which members of Lewis' corporate staff, if any, fall within the preceding limitations (particularly, whether any such person is responsible for and actively engaged in preparing Plaintiffs' case), and, therefore, the Court must presently decline to decide that said staff should generally be permitted access to "restricted-confidential" information. To the extent that Plaintiffs can demonstrate that certain members of said staff do fall within the preceding limitations, it appears that they might reach agreement with Defendants on such matter (or seek further relief in this Court) pursuant to the provisions of paragraph 5 of Plaintiffs' proposed protective order.

■ For the aforestated reasons, Defendants' motion seeking an Order of the Court protecting against certain disclosures of "restricted-confidential" information, is deemed to be not well taken insofar as it seeks an absolute prohibition against disclosure of such information to Lewis and, to that extent, said motion is overruled. "Restricted-confidential" information may be disclosed to Lewis provided that his uses of said information be limited to those specified in paragraph 4 of Plaintiffs' proposed protective order.

---

**2.** Defendants have not requested such absolute nondisclosure of "restricted-confidential" information and, as this Court intimated in its Order of October 28, 1980, it will not undertake to provide that form of protection absent *some demonstration* by Defendants that Plaintiffs' prosecution of this lawsuit is in fact an illegal anticompetitive device.

 

Insofar as Defendants' motion seeks protection against disclosure of "restricted-confidential" information to other regular employees of the parties (primarily, Lewis' corporate staff), it is well taken and, to that extent, said motion is sustained.

It is, therefore, ordered that "restricted-confidential" information may only be disclosed to: (1) Lewis; (2) other counsel not in the regular employ of the parties, and the associates and employees of such counsel; (3) independent experts and their staff; and (4) other persons agreed upon from time to time.

Although the Court does overrule Defendants' motion in part, it declines to issue an Order, pursuant to F.R.C.P. 26(c) ¶ 2, 37 (i. e., an Order *compelling* disclosure of "restricted-confidential" information to Lewis). No controversy over disclosure of a specific item of "restricted-confidential" information has been presented, herein, and, in view of the fact that the parties are in the process of negotiating, for stipulation, a broader protective order concerning means for controlling confidential disclosures, this Court does not wish to compromise those efforts by presently compelling uncontrolled disclosure to Lewis.

Similarly, although the Court does sustain Defendants' motion, in part, nothing in this decision is to be construed as *permanently* foreclosing access to "restricted-confidential" information by Lewis' corporate staff, either pursuant to the procedure set forth in paragraph 5 of Plaintiffs' proposed protective order (should the parties so stipulate) or, otherwise, by Order of this Court, upon Plaintiffs' motion and proper showing (should the parties not agree to Plaintiffs' proposed protective order).

To summarize:

(1) Plaintiffs' motion seeking the admission pro hac vice of Roger Lewis is sustained;

(2) Plaintiffs' motion seeking an Order of the Court awarding the expenses incurred in obtaining the Order issued by this Court on October 28, 1980, is overruled;

(3) no decision is entered upon Plaintiffs' motion seeking an Order of the Court compelling the nonparty Despatch to permit copying of certain documents, for reason that said motion has been improvidently filed, herein.

(4) Defendants' motion seeking an Order of the Court protecting against certain disclosures of confidential information is overruled in part and sustained in part, as further explained above.

Counsel listed below, with the exception of Counsel Pederson, will take note that a discovery-status conference will be had by conference call telephone at 4:30 p. m. on Friday, February 27, 1981. This conference will be had by way of conference telephone originated from the Courthouse. The attorneys listed below need not appear in chambers for such discovery-status conference but need only wait by their telephones at the appointed time.