**Regina M. NUNES–CORREIA, Plaintiff,**

v.

**Alexander HAIG, et al., Defendants.**

**No. CA 74–280.**

United States District Court,
District of Columbia.

July 13, 1982.

---

Bruce J. Terris & David A. Klibaner, Washington, D. C., for plaintiff.

Robert E. L. Eaton, Asst. U. S. Atty., Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

BRYANT, District Judge.

This case is now before the court on plaintiff Regina M. Nunes-Correia's request for attorneys' fees and expenses under the Equal Access to Justice Act of 1980 (the "Act"), Pub.L.No.96–481, 94 Stat. 2327 (1980), 28 U.S.C. § 2412 (1976 & Supp. IV). For the reasons set forth below, the court finds that the position of the government in

this case was not substantially justified, and grants Mrs. Nunes-Correia's request for fees and expenses.[1]

## HISTORY OF THE LITIGATION

Mrs. Nunes-Correia brought this action in 1974. She claimed she was illegally forced to resign from her career in the Foreign Service of the Department of State (the "Department") on the basis of unconstitutional regulations prohibiting employment to a person married to an alien who did not intend to become a United States citizen. Mrs. Nunes-Correia further alleged that she was prohibited reemployment based on the unconstitutional alien-spouse regulations. Mrs. Nunes-Correia sought reinstatement, full backpay, and all related benefits.

During the first three years of this litigation, the government took the position that the alien-spouse regulations were constitutional. By mid-1977, the State Department had rescinded most of the regulations. The government then moved to dismiss the case as moot; and argued in the alternative that even if the alien-spouse regulations were unconstitutional, Mrs. Nunes-Correia was not entitled to relief because her resignation and subsequent inability to obtain reemployment in the Foreign Service resulted from her unavailability for worldwide service.

The court rejected the government's mootness claim in 1979 and found that most of the alien-spouse regulations impermissibly infringed upon the constitutionally protected right to marry. Memorandum and Order, August 7, 1979 ("1979 Order"). On November 9, 1981, the court determined that the regulations, not Mrs. Nunes-Correia's unavailability for world-wide service, were the basis for Mrs. Nunes-Correia's forced resignation and the Department's re-

1. On July 2, 1982, the court approved the parties' "Stipulation with Respect to Adjudication of Plaintiff's Request for Attorneys' Fees Under Equal Access to Justice Act." In that stipulation, the parties requested that the court decide at this time only the question of Mrs. Nunes-Correia's entitlement to an attorneys' fees award pursuant to the Equal Access to Justice Act. The parties have already agreed about

some of the issues relating to the amount of a possible fee award, and have also agreed upon a schedule for resolving remaining issues in dispute. The court commends the parties for their efforts to narrow issues at the attorneys' fees stage of this litigation, and hopes that their example will be followed by parties in other cases.

fusal to rehire her. Memorandum and Order, November 9, 1981 ("1981 Order"). The court granted Mrs. Nunes-Correia's motion for summary judgment.

## THE ISSUES

Litigants who seek attorneys' fees awards under the Equal Access to Justice Act must satisfy a number of requirements imposed by the Act. The parties agree that this is a civil action against the government in which fees may be awarded; that Mrs. Nunes-Correia is a "prevailing party"; and that she meets the financial eligibility requirements of the Act. However the government contends that the Act does not authorize awards of attorneys' fees incurred prior to October 1, 1981; and that even if it does, Mrs. Nunes-Correia is not entitled to fees because the government's position was "substantially justified" and there are special circumstances mitigating against a fee award in this case. The court will address each of these issues in turn.

## THE ACT'S APPLICABILITY TO FEES INCURRED BEFORE OCTOBER 1, 1981

Section 208 of Pub.L.96–481 provided that: "This title and the amendments made by this title [amending, *inter alia*, 28 U.S.C. § 2412] shall take effect on October 1, 1981, and shall apply to . . . any civil action or adversary adjudication described in section 2412 of title 28, United States Code, which is pending on, or commenced on or after such date." 94 Stat. 2330 (1980) (*see* 28 U.S.C. § 2412 note and 5 U.S.C. § 504 note). Before the passage of the Equal Access to Justice Act, the doctrine of sovereign immunity barred fee awards against the United States absent clear or express statutory authority to the contrary. *Alyeska Pipeline Co. v. Wilderness Society*, 421

U.S. 240, 267–268, 95 S.Ct. 1612, 1626–1627, 44 L.Ed.2d 141 (1975); *NAACP v. Civiletti*, 609 F.2d 514, 516 (D.C.Cir.1979), *cert. denied*, 447 U.S. 922, 100 S.Ct. 3012, 65 L.Ed.2d 1114 (1980). The government asserts that since no language in the Act expressly and unequivocally waives sovereign immunity retroactively, the policy against implied waivers of federal sovereign immunity precludes courts from awarding fees incurred before October 1, 1981. *See Lehman v. Nakshian*, 453 U.S. 156, 160–161, 101 S.Ct. 2698, 2701–2702, 69 L.Ed.2d 548 (1981); *Brookfield Construction Co., Inc. v. United States*, 661 F.2d 159 (Ct.Cl.1981); *Nibali v. United States*, 634 F.2d 494, 497 (Ct.Cl.1980); *Fitzgerald v. United States Civil Service Commission*, 554 F.2d 1186, 1189 (D.C.Cir.1977).

While a number of courts have awarded fees for attorneys' services rendered before October 1, 1981, *see Heydt v. Citizens State Bank*, 668 F.2d 444 (8th Cir. 1982); *Kinzley v. United States*, 661 F.2d 187, 193 (Ct.Cl. 1981); *Matthews v. United States*, 526 F.Supp. 993, 1008 (M.D.Ga.1981); *Muth v. Marsh*, 525 F.Supp. 604, 609 (D.D.C.1981) ("[T]his action was obviously pending on October 1 and plaintiff may therefore apply for fees and costs * * * should he be the 'prevailing party' in this court"), only a handful of courts have addressed the retroactivity issue directly. In *Photo Data, Inc. v. Sawyer*, 533 F.Supp. 348 (D.D.C.1982), *appeal docketed*, No. 82–1644 (D.C.Cir. June 9, 1982), Judge Penn, relying on the principle that statutes should be given their plain, clear, and common readings, concluded that "[t]he Act explicitly applies to cases pending on October 1, 1981, and nothing in the legislative history suggests that it should be interpreted to apply only to that part of a case pending on October 1, 1981 that occurs on or after that date." *Id.* at 351.[2] In

**2.** In his opinion, Judge Penn also stated that "construing the Act to bifurcate cases on October 1, 1981 would eschew the purpose of the Act to provide financial assistance to those litigants who would not ordinarily be able to contest unreasonable government action, as it would diminish their recovery and thereby remove the incentive to sue." 533 F.Supp. at 351. The decisions courts reach on the bifurca-

tion issue cannot, however, retroactively affect the incentives to sue of litigants who filed their cases before October 1, 1981. Nor will these decisions affect future litigants, since the issue of fees for pre-October 1981 services will not arise in future cases.

Consideration of the retroactivity issue in light of the Act's incentive structure might, in fact, lead to the opposite conclusion than Judge

*Berman v. Schweiker,* 531 F.Supp. 1149 (N.D.Ill.1982) and *Wolverton v. Schweiker,* 533 F.Supp. 420 (D.Idaho 1982), courts construed the word "pending" in the statute to reach a similar conclusion.

However, in *Commodity Futures Trading Commission v. Rosenthal & Co.,* 537 F.Supp. 1094 (N.D.Ill.1982), the court pointed out that the "take effect" clause of the Act's effective date provision is surplusage unless it is read to apply to the "fees . . . incurred" language. Under that construction, the Act's allowance would extend only to "fees . . . incurred" after the . Act "take[s] effect on October 1, 1981." Relying on the rules that statutes should be read to give meaning to all their provisions, and that waivers of sovereign immunity should be construed narrowly, the court suggested that the doctrine of sovereign immunity precludes retroactive application of the Act, but reserved judgment on the retroactivity issue pending further briefing.

■ As the *CFTC v. Rosenthal* court acknowledged, *Photo Data* and *Berman* exemplify a "reasonable," and "perhaps even the normal" reading of the Act. 537 F.Supp. at 1096. The alternative construction is so strained that this court inclines to hold that the plain language of the statute explicitly authorizes fees for pre-October 1, 1981 work. That holding is, however, unnecessary because the Congressional Budget Office ("CBO") cost estimates, which the *CFTC* court stated it wished to consider in greater depth, demonstrate that Congress clearly intended the Act to apply retroactively.

According to the government, had Congress expected parties to be able to recover pre-October 1, 1981 fees in pending cases, Congress would have forecasted substantially greater expenditures during the Act's first year, when old cases such as the one here with large accumulated legal fees were

being decided or settled, than in the Act's second or subsequent years. The statistical reasoning underlying this argument is flawed. Since, *ceteris paribus,* the distribution of long-lived and short-lived cases terminated in 1982 and each subsequent year will remain constant, awarding fees for the entire litigation in cases pending on or after October 1, 1981 can be expected to result in constant expenditures over the years.

If, however, the Act does not cover pre-October 1981 work in pending cases, the estimated total payout will increase with the amount of post-October 1981 work performed in the cases. Since cases filed a long time before October 1, 1981 and terminated shortly after October 1981 will present less post-October 1981 work than cases terminated many years after 1981, under this assumption annual expenditures will rise sharply during the Act's first years, and then level off.

In fact, the Congressional Budget Office predicted that the annual expenditures under the Equal Access to Justice Act will vary directly with the number of cases terminated each year. In addition, the CBO assumed that the cost will increase as a result of increases in the federal caseload generally and as a result of inflation. Finally, the CBO predicted that the Act's incentive structure will over time increase the size of the awards and the number of cases in which awards are made. H.R.Rep. No.1418, 96th Cong.2d Sess. 21 *reprinted in* [1980] U.S.Cong. & Ad.News 4943, 4984, 5000 ("House Report").

When Congress passed the Equal Access to Justice Act, it had available the CBO estimate. Congress' acceptance of that estimate's assumption that the cost of the Act would vary only with cases' termination rate, inflation, and the Act's incentive effect, demonstrates that Congress clearly in-

Penn reached. Only once the Act was passed and its effective date established could litigants have changed their behavior in response to the Act's incentives. Awarding fees for post-October 1981 work exclusively would reward only those litigants who indeed responded to the Act's incentives. On the other hand, if the

Act's main purpose is not to alter incentives, but simply to spread equitably the cost of challenging unfair government regulations, that purpose would be furthered by awarding fees for services rendered throughout pending cases.

tended the Act to authorize fees for work performed before October 1, 1981. Compare *Brookfield*, 661 F.2d at 164 (where Congressional Budget Office stated that statute would not impose additional cost upon government, Congress in all likelihood did not contemplate such additional cost).

Even in the absence of the CBO estimate, the court would reach the same conclusion. "Despite a line of decisions to the effect that legislation will not be given retrospective effect absent a clear legislative mandate to the contrary, the Supreme Court has recently decided in several cases that 'a court is to apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or there is a statutory direction or legislative history to the contrary.'" *Hill v. United States*, 571 F.2d 1098, 1102 (9th Cir. 1978) (citations omitted). *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973), the first case to articulate this principle, concerned attorneys' fees. The Court held that 20 U.S.C. § 1617, a statute which provides for the recovery of attorneys' fees in desegregation cases, applied to cases pending on the statute's effective date, even though the statute's language and legislative history were silent regarding the statute's applicability to pending cases. This holding implicitly allowed fee awards for legal services rendered before the statute's effective date. Courts construing the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988, which also lacked a provision regarding the statute's applicability to cases pending on its effective date, have uniformly followed *Bradley* and held that § 1988 applied retroactively to all legal work performed in cases pending on the date of the statute's enactment. *See, e.g., Hutto v. Finney*, 437 U.S. 678, 695 n.23, 98 S.Ct. 2565, 2575 n.23, 57 L.Ed.2d 522 (1977); *David v. Travisono*, 621 F.2d 464, 467 (1st Cir. 1980); *Riddell v. National Democratic Party*, 624 F.2d 539, 543 (5th Cir. 1980); *Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 633–634 (6th Cir. 1979); *Wharton v. Knefel*, 562 F.2d 550, 557 (8th Cir. 1977).

The case for authorization of fees for work in "pending cases" performed before the effective date of the Act is stronger here than in *Bradley* and the other cases cited. Unlike the statute in *Bradley*, which was silent about the statute's effective date, the Equal Access to Justice Act explicitly authorizes awards in cases pending on or after October 1, 1981. The Congressional Budget Office cost estimate contemporaneously construing the Act also indicates that Congress intended the Act to authorize fees for work performed before October 1, 1981. As in *Bradley*, the only interests impaired by applying the statute retroactively are those of the government itself. While the doctrine of sovereign immunity is a viable, useful aid to statutory construction, abrogating the government's immunity from liability by retroactive application of the Act hardly constitutes "manifest injustice." *See Hill*, 571 F.2d at 1102. On the contrary, applying the Act retroactively accomplishes the Act's purpose of fairly distributing the cost of successful challenges to unfair government actions. Accordingly, the court holds that the Equal Access to Justice Act authorizes fees for work performed before October 1, 1981 in cases pending on October 1, 1981. *See Consumers Union of United States, Inc. v. Board of Governors of the Federal Reserve System*, 410 F.Supp. 63, 64 (D.D.C.1976) (sovereign immunity doctrine did not bar organization from recovering attorneys' fees incurred prior to the effective date of the Freedom of Information Act amendments, 5 U.S.C. § 552(a)(4)(E)).

## THE "SUBSTANTIAL JUSTIFICATION" STANDARD

The Equal Access to Justice Act provides for an award of attorneys' fees and other expenses "unless the court finds that the position of the United States was substantially 'justified or that special circumstances make an award unjust." § 2412(d)(1)(A). "Position" refers both to the government's position in prosecuting or defending the litigation and the governmental action upon which suit is based. *Photo Data*, 533 F.Supp. at 352 n.7. *Con-*

tra, *Alspach v. District Director of Internal Revenue*, 527 F.Supp. 225, 228 (D.Md.1981). *See also Papson v. United States*, No. 602–80T, 82–2 U.S.T.C. ¶ 13,466, 49 A.F.T.R.2d (P–H) 148, 163 (Ct.Cl. April 28, 1982); *Citizens' Coalition for Block Grant Compliance v. City of Euclid*, 537 F.Supp. 422 (N.D.Ohio 1982). The burden of proving "substantial justification" is on the United States. H.R. Rep.No.1434, 96th Cong.2d Sess. 22 *reprinted in* [1980] U.S.Code Cong. & Ad.News 5003, 5011.

Since few courts have yet construed the Act's "substantial justification" language, the court must look to legislative history to give meaning to the standard. The House Report says that "[i]n order to defeat an award, the government must show that its case had a reasonable basis in law and fact." House Report at 10 (4989). The report characterizes the "substantial justification" standard as an "acceptable middle ground" between automatic awards to prevailing parties and awards made only where government action was "arbitrary, frivolous, unreasonable, or groundless, or the United States continued to litigate after it clearly became so." *Id.* at 14 (4993). Since the Senate Judiciary Committee refused to adopt an amendment which would have changed the language governing fee awards from "substantially justified" to "reasonably justified," the applicable standard is slightly above one based on reasonableness. *Wolverton v. Schweiker*, 533 F.Supp. at 424.

The government contends, by analogy to the Fed.R.Civ.P. 37 language upon which the "substantial justification" standard is patterned, that fees should be awarded only where the government has defended a case when "no genuine dispute exists." *See* Advisory Committee's Note to 1970 Amendment of Fed.R.Civ.P. 37(a)(4), 48 F.R.D. 487, 540. Unfortunately, the "no genuine dispute" standard is hardly more informative

than the "no substantial justification" one. Cases about Rule 37 fee awards which the government brings to the court's attention are not helpful, since different cases interpret the standard differently.[3]

■ The Rule 37 Advisory Committee's discussion of cases which present "no genuine dispute" refers to "frivolous requests for or objections to discovery." 48 F.R.D. at 540. This reference indicates that the Rule 37 "substantial justification" standard may be satisfied more easily than the "substantial justification" standard of the Act. The aspect of Rule 37 most stressed by the Act's legislative history is Rule 37's 1970 amendment encouraging wider use of expense awards and discouraging unnecessary recourse to the courts. *See* House Report at 18 (4997). *See also* 4A Moore's Federal Practice ¶ 37.02(10). The legislative history's emphasis upon Rule 37's 1970 amendment suggests that Congress did not wish to restrict fee awards under the Act to only a minute number of cases. Consequently courts applying the Rule 37 precedents to Equal Access to Justice Act cases "should temper them with the clear indications in the Act's own legislative history that mere absence of bad faith or of deliberate abuse of the legal process is not enough to avoid an award of fees and expenses." Robertson and Fowler, Recovering Attorneys' Fees Under the Equal Access to Justice Act, 56 Tulane Law Review 903, 933 (1982).

## WAS THE GOVERNMENT'S POSITION "SUBSTANTIALLY JUSTIFIED"?

Mrs. Nunes-Correia brought this suit to challenge the constitutionality of the Department of State's alien spouse regulations. She alleged that these regulations, which resulted in her forced retirement as a Foreign Service Staff secretary in September 1971 and prevented her reemployment, violated her right to due process under the

---

**3.** *See, e.g., Baxter Travenol Laboratories, Inc. v. Lemay*, 89 F.R.D. 410, 417 (S.D.Ohio 1981) (Court refused to grant fee award because of "the difficulty of the significant legal questions presented." The opposition "was not the kind of capricious or frivolous conduct upon which such an award might be based."); *SCM Societa*

*Commerciale S. P. A. v. Industrial & Commercial Research Corp.*, 72 F.R.D. 110, 113 n.3 (N.D.Tex.1976) (reasonableness standard); *Technitrol, Inc. v. Digital Equipment Corp.*, 62 F.R.D. 91, 93 (N.D.Ill.1973) (fees denied because plaintiff made "a good faith attempt" to comply with discovery request).

Fifth Amendment and impermissibly infringed upon her right to marry. The government contended that the alien-spouse regulations governing Foreign Service personnel had a rational basis.

Since the court did not accept the government's contention that recision of the regulations rendered this lawsuit moot,[4] the court ruled on the constitutionality of the regulations. The court held that the regulations could not withstand the "critical examination" called for in light of the burden on the right to marry. 1979 Order at 33. Moreover, the court determined that "[e]ven under the dictates of *[Califano v.] Jobst*, [434 U.S. 47, 53–54, 98 S.Ct. 95, 99–100, 54 L.Ed.2d 228 (1977) (reasonable regulations that do not significantly interfere with decisions to enter the marital relationship may legitimately be imposed)], the alien-spouse regulations were invalid because defendants have failed to show that the alleged reasons on which the rule rested could withstand even the most cursory analysis." *Id.*

The court based its holding on a number of facts which demonstrated that the alien-spouse rule failed to meet the rational relationship test. The court found that the State Department regularly employed people married to aliens in positions as sensitive as those applied for by Mrs. Nunes-Correia. In fact, Mrs. Nunes-Correia herself worked for a year and a half after her marriage in the Consulate-General in Lourenco-Marques. Since the regulations did not require dismissal of employees whose alien-spouses did not act on their intention to become citizens, some Foreign Service officers worked for fifteen to twenty years before their spouses actually acquired citizenship. For these and other reasons, the court concluded that "[w]hile the State Department is not required to fashion its regulations with absolute precision, the brush utilized in drawing the regulations at issue here was far too broad." 1979 Order at 33.

▪ The court's holding demonstrates that the Department's efforts to defend the alien-spouse regulations from the inception of the lawsuit until the regulations' recision had no reasonable basis in law. The court's findings that the interests the regulations purported to advance were not consistently protected, either by even-handed application of the alien-spouse regulations, or by other possible regulations, show that the regulations' enforcement was essentially arbitrary and their defense had no reasonable basis in fact. Accordingly, the court holds that the government's position in this case was not substantially justified, and awards Mrs. Nunes-Correia attorneys' fees for the period February 13, 1974 to January 11, 1977.[5]

4. A case is not moot so long as any single claim for relief remains viable, whether that claim was the primary or secondary relief originally sought. *See Powell v. McCormack*, 395 U.S. 486, 496, 500, 89 S.Ct. 1944, 1950, 1952, 23 L.Ed.2d 491 (1969); *Ramer v. Saxbe*, 522 F.2d 695, 704 (D.C.Cir.1975). The court rejected the government's mootness claim because it found that Mrs. Nunes-Correia continued to seek a fair processing of her application even after the regulations' recision, and because Mrs. Nunes-Correia's damage claim was founded on the regulations' unconstitutionality. 1979 Order at 6–8, 12, and 24–25.

5. Mrs. Nunes-Correia urges that the court consider the Department's conduct in rescinding the regulations and government counsel's assessment of the regulations as evidence of "no substantial justification." Since the court's finding of "no substantial justification" is based on its own observations about the regulations' enforcement and its own evaluation of the government's legal arguments, it need not reach these issues.

With respect to the recision argument, the court observes that evidentiary principles usually preclude inferences from subsequent remedial measures, in order not to discourage remedial efforts. *See* F.R.E. 407. The fact that the regulations' recision may have flowed from policy rather than legal considerations also raises the question whether the government can have "substantial justification" for defending on legal grounds actions which it disavows for policy reasons. The legislative history of the Equal Access to Justice Act suggests that the Act wishes to award with attorneys' fees citizens whose lawsuits serve to correct governmental error and refine and formulate public policy. House Report at 10 (4988). However, courts may generally evaluate only the legal bases for governmental action, not the policy reasons.

As to counsel's evaluations, the court notes that while here government counsel's assessments of the regulations at issue were not priv-

In the event the court did not accept its mootness argument, the government contended that even if the alien-spouse regulations were constitutionally suspect, Mrs. Nunes-Correia was not entitled to relief because her resignation and subsequent inability to obtain reemployment in the Foreign Service were affected by her unavailability for world-wide service. The government's mootness argument, though rejected by the court, was reasonable in law and fact. Since the government tried, but failed, to dismiss the suit, it would be unjust to award Mrs. Nunes-Correia attorneys' fees for the period after the regulations' recision if the government's alternative position was "substantially justified."

The government's alternative position was twice scrutinized by the court. In its 1979 Order, the court concluded that "[w]hile it is evident that Mrs. Nunes-Correia was not available for world-wide service after she decided to marry Dr. Nunes-Correia, there is no evidence in the record that this unavailability motivated those who discussed her resignation with her." 1979 Order at 37–38. The court found the Department continued to give jobs to persons who were not available for world-wide service and in fact had a program designed specifically for the employment of persons in plaintiff's position. *Id.* at 38. The court noted that the Department was willing to offer Mrs. Nunes-Correia a position in Opporto, Portugal, even though she was unavailable for world-wide service. *Id.* at 39. The court also observed that "[d]efendants offer many other hypertechnical explanations for failing to hire plaintiff," and, after analyzing each explanation, the court concluded that "none carry any weight . . . ." *Id.* at 11–12. The court nevertheless refused to grant Mrs. Nunes-Correia summary judgment in light of "defendants' contention, however unsupported factually in the current record, that other factors entered into their decision . . . ." *Id.* at 41.

The government then submitted additional material which the court reviewed in its 1981 Order. The court wrote: "Defendants have not submitted any new evidence which could possibly overturn these findings [of August 7, 1979] or even raise any issue of material fact." 1981 Order at 2. "[T]he evidence offered by defendants further supports plaintiff's claim that she was forced to resign from the Foreign Service and refused reemployment on the basis of the Department's alien-spouse rule and not on any other legitimate grounds . . . . The court has reviewed Ms. Thomsen's deposition and found that under no honest reading of her entire testimony could it be determined that she supports the defendants' contentions." *Id.* at 2–3.

The government states that despite the court's decision, it continues to believe that there is a real dispute as to the circumstances surrounding Mrs. Nunes-Correia's resignation, and that the factor of world-wide availability had as much to do with Mrs. Nunes-Correia's aborted Foreign Service career as any other factor. The government maintains that its position was reasonable and had some support in the Thomsen deposition contained in the record. The court, however, carefully considered the evidence upon which the government relies when it ruled upon Mrs. Nunes-Correia's summary judgment motion. The court concluded that "no honest reading" of that evidence supports the defendants' contentions and held that "the evidence, as a whole, is overwhelming that plaintiff was forced to resign from the Foreign Service and denied reemployment on the basis of the Department's alien spouse regulations." 1981 Order at 2. The government is free to believe what it wishes; but the court adheres to the conclusions of its 1979 and 1981 orders. The government's alternative position concerning Mrs. Nunes-Correia's unavailability for world-wide assignment had no "substantial justification." Mrs. Nunes-Correia is therefore entitled to a fee award for attor-

ileged, such evaluations would ordinarily constitute privileged matter. Counsel's evaluations in this case can also be read to rely more on policy than on legal considerations, again

raising the question whether the government can have "substantial justification" for defending actions which it has abandoned for policy reasons.

neys' services rendered throughout this litigation.

## ARE THERE "SPECIAL CIRCUMSTANCES"?

The Equal Access to Justice Act provides that the government should not be held liable where "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). The legislative history of the Act instructs that "[t]his 'safety valve' helps to insure that the Government is not deterred from advancing in good faith the novel but credible extensions and interpretations of the law that often underlie vigorous enforcement efforts. It also gives the court discretion to deny awards where equitable considerations dictate an award should not be made." House Report at 11 (4990).

The government argues since this is the only litigation which challenged the constitutionality of the alien-spouse regulations, it was reasonable, if not obligatory, for the government to assert all pertinent defenses. The government contends its arguments were "thus novel, credible and as yet untested." Defendants' Opposition to Plaintiff's Motion for Attorneys' Fees, March 23, 1982 at 13.

■ Since Mrs. Nunes-Correia brought the only litigation challenging the constitutionality of the alien-spouse regulations, of course the government's arguments were as yet untested. But the argument that the alien-spouse regulations were rationally related to a legitimate governmental interest was hardly a novel theory. And it certainly does not follow that because the government's argument was untested, it was necessarily worthy of credit. On the contrary, the number of unchallenged regulations which can reasonably be defended is likely to be smaller than the number of regulations which have already withstood some judicial scrutiny. The "special circumstances safety valve" does not create a different, less rigorous standard of review for all cases of first impression. It merely preserves government efforts to present creative legal interpretations, which though not yet commonly accepted, still merit the court's careful examination.

The government next points out that since judgment for Mrs. Nunes-Correia was entered orally from the bench in July 1981, only the passage of time from July 1981 until entry of the court's November 9, 1981 order renders this action amenable to the Act's provisions. The government suggests that the peculiar timing of the summary judgment order in this case is the type of special circumstance that makes a fee award unjust. *See Matthews v. United States*, 526 F.Supp. 993, 1009 (M.D.Ga.1981).

■ While the court acknowledges that Mrs. Nunes-Correia's eligibility for a fee award under the Act is in some ways fortuitous, the court does not accept the government's suggestion. Cases on appeal are "pending" for the purposes of the Equal Access to Justice Act. *See Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1973). The government filed a notice of appeal in this case on January 8, 1982, and did not move to dismiss its appeal until April 16, 1982. Even had the court filed its summary judgment order in July, the government's five-month resort to the appeal process would have extended the pendency of this litigation beyond October 1, 1981. Thus the lapse of time between the court's oral and written rulings was harmless and does not render a fee award unjust. There are no special circumstances which defeat a fee award in this case.

Accordingly, it is this 14th day of July 1982,

ORDERED that Mrs. Nunes-Correia's request for reasonable attorneys' fees and expenses pursuant to 28 U.S.C. § 2412(d)(1)(A) is GRANTED.