Peggy J. MATTHEWS, Plaintiff,

v.

UNITED STATES, et al., Defendants.

Civ. A. No. 80–16–ATH.

United States District Court,
M. D. Georgia,
Athens Division.

Nov. 19, 1981.

H. Glen Willard, Jr., and H. Bruce Jackson, Atlanta, Ga., for plaintiff.

Eugene A. Epting, Athens, Ga., William C. Lanham, Atlanta, Ga., Bernard E. Namie, Macon, Ga., for defendants.

OWENS, District Judge:

Plaintiff in this case challenges the Corps of Engineers' authorization of the placement and operation of a condominium-style boat dock as a part of a commercial marina on Lake Hartwell in Hart County, Georgia. This district court has jurisdiction of this action under 28 U.S.C.A. §§ 1331(a), 1346, and 1361 and 5 U.S.C.A. § 702 (Administrative Procedure Act). A non-jury trial was held in Macon, Georgia on January 13 and 14, 1981, following which the parties submitted briefs on the relevant issues. This opinion constitutes the court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure.

### FINDINGS OF FACT

Lake Hartwell, located in the Piedmont Plateau region of Georgia and South Carolina, is owned by the United States and is under the administration of the Army Corps of Engineers. In June, 1965, the Corps of Engineers executed a thirty-year commercial concession lease (Lease No. DA–09–133–CIVENG–65–163) to Tugaloo Development Corp. for 14.10 acres of Hartwell Lake shoreline or "collar lands;" in September, 1973, this lease was assigned to defendant Harbor Light Marina, Inc. (Harbor Light). The lease specifically authorizes Harbor Light to furnish facilities and provide and maintain docks for privately-owned boats, to service and care for privately-owned boats, to sell gasoline and oil, and to rent boats and transport passengers for hire, all for the benefit of the boating

public. Defendants Warren and Sidney Moore are officers, directors, shareholders, and managers of Harbor Light Marina, Inc.

The main Harbor Light Marina complex consists of six large docks containing multiple boat slips which, with the exception of Dock "D–1," are provided to the public on a Corps of Engineers approved rental basis. In December, 1978, Warren Moore and the other individual defendants, who until that time were renting boat slips in the main marina complex, completed the construction of a large condominium-type boat dock designated "Dock F," which is located some three-fourths of a mile around the shoreline from the main marina complex and adjacent to plaintiff's property and lake house. Plaintiff thereafter brought this suit alleging, inter alia, that the location of Dock "F" adjacent to her property has caused a diminution in the value of her property and that the large houseboats anchored at Dock "F" obstruct her view of the cove in which her property as well as Dock "F" are located, and of the open lake beyond.

The proposal to construct a condominium-style boat dock in the area leased to Harbor Light Marina to be financed, constructed, owned, and maintained by private individuals rather than by Harbor Light Marina was first submitted to Warren Moore in late 1976 by several of the individual defendants. Warren Moore approved of the proposal, a "Dock F Association" was formed by eleven interested individuals including Warren Moore, and construction plans for the dock were drawn up by contractors hired by Dock F Association. The proposed location of Dock "F" was in an area adjacent to private property owned by Harbor Light Marina, Inc., and the individuals in Dock F Association purchased a piece of that property designated Lot "C" for use in connection with the dock. Plans for the construction and method of ownership and operation of Dock "F" were submitted to the Corps of Engineers through Warren Moore and Harbor Light Marina, Inc., as required by the terms of the commercial concession lease between the Corps and Harbor Light. In November, 1977, the Corps of Engineers approved the construction and location of Dock "F" and its operation on a condominium basis with ownership in the eleven individuals in Dock F Association.

It is stipulated that the construction of Dock "F" began in April, 1978, and was substantially completed in June, 1978, with the final installments of permanent fixtures for telephone and electric lines being completed in January, 1979. The total cost of Dock "F" was approximately $20,247.93, this entire amount being paid by the eleven individuals owning slips in Dock "F." In addition, each individual owner was required to pay the sum of $50 into an escrow account for maintenance and repair of the dock and for utilities. Ten percent of these amounts, or approximately $2,080, was paid to Harbor Light Marina which reported this amount as income from slip rental. (Deposition of Warren Moore, p. 53). Of that ten percent, 3% or $624 was paid to the United States under the lease (Affidavit of Fred Allen), leaving a total profit to Harbor Light Marina of approximately $1,456.

Since under the terms of the commercial concession lease only Harbor Light Marina could construct docking facilities, the defendants thought it was necessary as a matter of formality that Harbor Light Marina issue bills of sale for the slips in Dock "F" to the eleven individual owners. These bills of sale purport to pass title to the eleven individual defendants, and provide that Harbor Light is authorized to expend funds from the escrow account as may be necessary for repairs on Dock "F" and to pay insurance and utility bills, but "if and only when" the individual owners fail to do so. The bills of sale provide further that the sale of Dock "F" is made subject to the terms of the commercial concession lease. While Harbor Light Marina, Inc., as a matter of form remains ultimately responsible to see that the owners of Dock "F" do not violate the terms of that lease, in reality, Harbor Light Marina, Inc., itself has had little, if any, involvement in the planning, construction, operation, or supervision of Dock "F."

Dock "F" is located approximately three-fourths of a mile around the shoreline from the main marina complex and is not visible from the main marina. Lot "C," which the members in Dock F Association paved for use as a parking lot, is adjacent to the shoreline to which Dock "F" is moored and provides access across public "collar lands" to Dock "F." At least two of the parking spaces constructed for Lot "C" actually extend onto public collar lands. The public has no access to Dock "F" other than by boat or by walking along the public shoreline. At one time "Private Property" or signs containing a similar message were posted on or around Dock "F," and were removed only after protests by Corps officials. Dock "F" is used exclusively by the eleven individual defendants or their invitees. No public services or facilities such as a boat ramp, restrooms, food, fuel pumps, or other such services are associated with Dock "F." The individual owners of Dock "F" can normally obtain such services offered by the marina only by travelling to the marina by boat or by car. No security protection is provided for Dock "F" by Harbor Light Marina.

Warren Moore testified at trial that he spoke to plaintiff in 1976 regarding the possibility of a dock being built in the area near her property, and she objected. She was given no further notice by Warren Moore, the Corps of Engineers, or any of the individual defendants of the proposed construction of Dock "F." Plaintiff first saw the dock around either the last weekend in June or the first weekend in July, 1978, by which time construction of the main structure of the dock was substantially completed. Plaintiff testified that she visited the lake only on weekends, and that she had been absent from the lake for four weeks prior to the date she first noticed Dock "F." Even assuming that plaintiff may have seen some activity on Lot "C" in preparation for construction of the dock, such activity would not be inconsistent with the building of a home on Lot "C" and would likely not have been such as would give her notice of construction of a dock at that location. Soon after noticing Dock

"F" plaintiff obtained an attorney who notified the Corps of Engineers of plaintiff's objections to Dock "F" and who, from July, 1978, through November, 1979, attempted to resolve the matter with the Corps of Engineers directly and ultimately through the office of Georgia Senator Nunn. Those avenues being unsuccessful, plaintiff filed this suit on March 6, 1980.

Plaintiff's property abuts an area of shoreline included within the commercial concession lease to Harbor Light Marina and begins approximately ninety feet from Lot "C" toward the landlocked end of the cove. Plaintiff purchased her property in June, 1974, through Warren Moore from Harbor Light Marina, Inc. Plaintiff's property was a part of a multi-acre parcel of property adjacent to and behind the public shoreline under the commercial concession lease and owned by Harbor Light Marina, Inc. through Holiday Land Company, a related entity also owned by Warren and Sidney Moore. At the time plaintiff purchased her lot, Warren Moore had initiated plans to develop a portion of the property for residential purposes with the hope that the public would be eager to purchase homes on Lake Hartwell near I-85. With this idea in mind he employed a surveyor to mark off approximately seven acres into proposed lots and on two of these lots he constructed model homes for view and inspection by the public. One of these homes is that purchased and presently owned by plaintiff.

A plat attached to the deed from Harbor Light Marina, Inc. to plaintiff designated her property as Lot "A," being a plat only of that particular lot, and the deed itself contained a restriction limiting the use of the lot to residential purposes only. (Plaintiff's Exhibit 3). In 1976 plaintiff purchased an additional lot adjacent to Lot "A," this second lot having no designation and containing no use restrictions. A third lot was purchased from Harbor Light Marina, Inc., in May, 1975, by Warren Moore with a similar restriction in the deed as to residential use. (Plaintiff's Exhibit 2). The second model home stood on a lot designated Lot "D" and was sold without any

residential use restrictions in the deed. To each of these deeds was attached a plat of the particular lot, but no common plat covering all of the approximately seven acres of property was ever developed, although outlines of lots may have been penciled in on a map. Soon after the sale of Lot "A" to plaintiff, Warren Moore and Harbor Light Marina, Inc., abandoned the plans to sell the land in lots for residential purposes, and no additional lots were sold until the 1978 purchase of Lot "C" by the individual defendants. The deed to that lot contained no use restrictions. The principal reasons for Warren Moore's abandoning the plans to develop the property for lake homes appear to have been a poor economy and the fact that changes in the Lake Hartwell Lakeshore Management Plan were taking place which were likely to affect the property, including the prohibition of private docks in marina areas.

One final fact bears noting prior to addressing the legal arguments in this case. Some time after plaintiff purchased Lot "A," the Corps of Engineers required plaintiff and Harbor Light Marina to remove a private dock in the vicinity of the present location of Dock "F," which dock was then being used by plaintiff as her personal dock. The reason given for requiring removal of the dock apparently was that the dock was located in an area reserved for use by the public and had not been approved by the Corps.

## CONCLUSIONS OF LAW

At this point, a summary of plaintiff's complaint and prayer for relief is appropriate. Count One of plaintiff's complaint alleges that the operation of a private dock in a public recreation area is illegal; and therefore, that the sale of slips in that dock or the private ownership of that dock in such an area should be declared void, and defendants should be required to remove Dock "F" from its present location.

Count Two alleges that the United States failed to abide by and enforce the law, regulations, Lakeshore Management Plan and Lease in managing and operating public property and in allowing the operation of a private dock within the confines of public property.

Count Three alleges that the United States, Harbor Light Marina, Inc., and Warren and Sidney Moore, as agents of the United States, have engaged in taking of plaintiff's property without due process of law.

Count Four alleges a conspiratorial course or scheme of conduct between the United States and Harbor Light Marina, Inc., Sidney L. Moore and Warren A. Moore to benefit private individuals to the exclusion of the public in the operation of Dock "F" and to the injury of private investment.

Count Five, a claim pendent to the federal claims, alleges a breach or violation by Harbor Light Marina, Inc., Sidney L. Moore and Warren A. Moore, and the individual defendants, of restrictive covenants in deeds with regard to residential use and with regard to the Lease. Plaintiff seeks an injunction requiring the individual defendants to use their property only for residential purposes.

Count Six alleges the unlawful destruction of public property by the removal or alteration of natural formations and vegetation by the Defendants and the failure of the United States to lawfully manage public property and protect private investment.

Count Seven, as amended by the First Amendment to Plaintiff's Complaint, is an action for judicial review of agency action pursuant to the Administrative Procedure Act, 5 U.S.C.A. § 701 et seq., alleging the consistent refusal by the United States to comply with applicable law and regulations.

Count Eight, as amended by the First Amendment to Plaintiff's Complaint, alleges such a pattern of breach of the Lease by Harbor Light Marina, Inc., and such violation of law, that the Lease should be revoked, and demands that the United States be directed and required to secure effective management of public lands.

Finally, plaintiff prays that she be awarded her costs and attorney's fees in this action.

## I. *Standing*

▮ Plaintiff brings this action both as an individual private landowner whose property allegedly has been adversely affected by the conduct of defendants, and further as a member of the general public whose interest in the proper administration of public properties has been adversely affected by defendants. Plaintiff clearly has standing to challenge the placement and operation of Dock "F." With respect to that claim, plaintiff alleges a "personal stake in the outcome of the controversy" and a distinct and palpable injury to herself likely to be redressed if the requested relief is granted, *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and plaintiff is a person "adversely affected or aggrieved by agency action" within the meaning of the Administrative Procedure Act, 5 U.S.C.A. § 702. *See, United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

However, it is the court's opinion that plaintiff does not have standing to challenge the operation of Dock "D–1", or with respect to her claim that the United States has failed to effectively manage other public lands around Lake Hartwell in accordance with applicable laws, regulations, and the Lakeshore Management Plan. As to these claims, the harm asserted by plaintiff is only a generalized grievance shared in substantially equal measure by all or a large class of members of the public. *See, Gladstone Realtors v. Bellwood*, 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Warth v. Seldin, supra; Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Although Dock "D–1" is operated in a somewhat similar fashion as Dock "F," plaintiff has not shown any distinct injury to herself caused by the operation of Dock "D–1" in that fashion. Further, the court notes that at trial plaintiff presented no persuasive evidence of violations of regulations by the Corps of Engineers with respect to other specific public lands around Lake Hartwell. For these reasons, the court may properly consider only plaintiff's allegations relative to Dock "F" and the pendent state claim of breach of restrictive covenants.

## II. *Laches*

▮ Defendants contend that plaintiff's action is barred by the equitable doctrine of laches. Three independent criteria must be shown by defendant before laches can be invoked to bar litigation: (1) a delay in asserting a right or claim, (2) the delay was not excusable, and (3) undue prejudice to the party against whom the claim is asserted. *Environmental Defense Fund v. Alexander*, 614 F.2d 474, 478 (5th Cir. 1980), *reh. den.*, 616 F.2d 568. Whether laches bars an action in a given case depends on the circumstances of the particular case. *Id.* One of the primary elements in determining whether delay is inexcusable is whether the person against whom the doctrine of laches is being asserted had knowledge of the facts which gave rise to her cause of action. *Armstrong v. Maple Leaf Apartments, Ltd.*, 436 F.Supp. 1125 (D.Okl. 1977). Further, when government action is involved, members of the public are entitled to assume that public officials will act in accordance with law, and the government must show that those whom it seeks to bar by invoking laches were or should have been aware of the questionable nature of the governmental activity. *Environmental Defense Fund v. Alexander, supra*, at 479.

▮ There is no question that there was a substantial delay between the construction of Dock "F" and the bringing of this lawsuit. As stated in the findings of fact, however, plaintiff did not have actual knowledge or good reason to have knowledge of the construction of Dock "F" until late June or early July, 1978. She promptly employed an attorney who, in October, 1978, complained to the Corps of Engineers explaining Ms. Matthews' contentions that Dock "F" violated applicable regulations and the lease to Harbor Light Marina, and requesting a meeting to try to settle the matter. The Corps of Engineers was the party responsible for the placement and operation of Dock "F" and was the proper party to complain to about the dock. The

Corps did or should have informed Harbor Light Marina and the individual owners of Dock "F" of Ms. Matthews' complaint. Mr. Holcombe knew of Ms. Matthews' opposition to the dock because he wrote her in November, 1978, offering to allow her use of Dock "F." Nevertheless, the owners of Dock "F" proceeded with the installation of telephone and electrical connections to Dock "F," apparently without inquiring of the Corps of Engineers or Harbor Light Marina, which should have been supervising construction of the dock, as to the proper course of action, and without approaching plaintiff regarding her complaint.

The first point in time at which Ms. Matthews could have brought suit was when she had actual knowledge of Dock "F" in late June or early July, 1978, by which time construction of the dock was substantially completed. Lack of knowledge of Dock "F" excuses her failure to bring suit during that time. For some time thereafter, plaintiff attempted to meet with the Corps of Engineers to discuss the matter. Plaintiff could have brought suit seeking at least preliminary relief sometime in the Fall of 1978, rather than attempting for a second time to arrange a meeting with the Corps of Engineers. However, there is no evidence as to what extent installment of the electrical and telephone connections had progressed by that time, although it is known that they were completed by January, 1979, and thus it is difficult to determine if and to what extent defendants were prejudiced by plaintiff's failure to bring suit, say, in November or December, 1978. There appears to be no good reason for the delay in bringing suit between January, 1979, and March, 1980, other than the fact that plaintiff was attempting to pursue the matter through Senator Nunn's office. However, since Dock "F" had already been completed by January, 1979, no undue prejudice resulted to defendants by the delay between January, 1979, and March, 1980. Defendants, with the exception of the possible loss of a clear memory regarding the events leading up to this suit, have not been prejudiced by plaintiff's delay in bringing suit during that period. In sum, under all of the circum-stances of this case, it is the court's best judgment that defendants have failed to meet their burden of showing laches on the part of plaintiff such as would in equity bar this action.

### III. *Breach of Restrictive Covenant*

In a claim pendent to her federal claim, plaintiff alleges that the individual defendants, Harbor Light Marina, Inc., and Sidney and Warren Moore, have breached a restrictive covenant of her deed limiting the property in question to residential use by permitting the use of Lot "C" as a parking lot. Relying on the 1974 plans of Warren Moore to sell houses on the property owned by Harbor Light Marina, the restrictive residential covenants contained in plaintiff's deed to Lot "A" and the deed to Warren Moore, and the use of the words "subdivision streets" in the deed to Warren Moore, plaintiff contends that an implied reciprocal covenant restricting Lot "C" to residential use exists and is binding upon her and the owners of Lot "C."

 It is well settled under Georgia law that as a general rule the owner of land in fee has the right to use the property for any lawful purpose, and limitations or restrictions on such use are not favored and must be clearly established and strictly construed. *Sissel v. Smith*, 242 Ga. 595, 250 S.E.2d 463 (1978). *Accord, Williams v. Waldrop*, 216 Ga. 623, 118 S.E.2d 465 (1961); *Reid v. Standard Oil Co. of Kentucky*, 107 Ga.App. 497, 499, 130 S.E.2d 777 (1963). The general rule with respect to implied restrictive covenants was stated by the Georgia Supreme Court in *Williams v. Waldrop, supra*, to be as follows:

"[W]here the owner subdivides his land into lots, and the restrictions imposed by him on the use of the lots are limited only to those lots where the deeds to purchasers specifically incorporate the restrictions, and are not expressly made applicable to all lands in the subdivision, to be sold or retained, such restrictions would apply to the unsold lots of the owner only by implication. *In such a situation the restrictive clause must be construed in*

*the light of the other facts of the record and intention of the parties."* (Emphasis added).

■ It is important, then, to consider all of the facts relative to this claim of an implied restrictive covenant, including the intentions of Warren Moore. No specific plans or plats or general scheme of residential development were ever prepared for this property. Warren Moore's plans for the development of the property were based upon the speculation that the area might have a special attraction to the public because of its proximity to Interstate 85. Residential development of the property beyond the two model homes was tentative and depended on the extent of public interest in owning homes in the area. Under these circumstances, it is difficult for the court to believe that by including the restrictive residential covenant in two deeds Warren Moore implicitly intended to forever restrict all of the property in the area to residential use whether or not additional lots were sold. The purpose of the restrictive covenants was to protect the owner of the land and future purchasers of other nearby lots, if any additional lots were sold. Plaintiff's lot and home being a model for view and inspection by the public, Harbor Light Marina naturally wanted to prevent plaintiff from using her property for other than residential purposes. During the same period of time during which these two restricted lots were sold, two additional lots, including the second lot purchased by plaintiff, were conveyed without any restrictions in the deeds. Thereafter, for various legitimate reasons the plan to develop the property for residential purposes was abandoned, and no further lots were sold for several years until the sale of Lot "C" in 1978.

Plaintiff could have reasonably assumed from the construction of the two model homes and a private home by Warren Moore, from the terms of her deed to Lot "A," and from the existence of residential developments in the vicinity of other marinas on Lake Hartwell, that the property around her home would become a residential development. Nevertheless, under the totality of the circumstances of this case and under applicable Georgia law, the court is unable to find the existence of an implied restrictive covenant limiting Lot "C" to residential use.[1]

IV. *Disposal of Sewerage and Waste*

Plaintiff contends that the Corps of Engineers and Harbor Light Marina have permitted the unlawful discharge of sewerage from boats berthed at Dock "F." The regulations promulgated by the Corps of Engineers provide:

"The discharge or placing of sewerage, galley waste, garbage, refuse, metal cans, or pollutants into the project waters from any vessel or watercraft is prohibited." 36 C.F.R. § 327.3(i). The Hartwell Lake Lakeshore Management Plan, Appendix F, para. 39 provides that regulations and minimum standards for disposal of sewerage into Lake Hartwell are defined by the U. S. Environmental Protection Agency (EPA). The EPA regulations applicable to discharge of sewerage into freshwater lakes provide:

"In freshwater lakes, freshwater reservoirs or other freshwater inpoundments whose inlets or outlets are such as to prevent the ingress or egress by vessel traffic subject to this regulation, or in rivers not capable of navigation by interstate vessel traffic subject to this regulation, marine sanitation devices certified by the U. S. Coast Guard . . . installed on all vessels shall be designed and operated

---

1. The court notes that this case is a good example of the purpose of the requirement that implied restrictive covenants must be clearly established. Harbor Light Marina has proposed plans to expand the marina by developing this property to add additional parking, a small shopping area, mobile home sites, public bathing facilities, and even a Par Three golf course.

The property has been shown to have little potential as solely a residential area. To enforce an implied restrictive covenant against the as yet undeveloped property at issue here would reduce the value of the property to Harbor Light and thwart its plans for future development.

to prevent the overboard discharge of sewerage, treated or untreated, or of any waste derived from sewerage.

"(2) In all other waters, Coast Guard-certified marine sanitation devices installed on all vessels shall be designed and operated to either retain, dispose of, or discharge sewage.

\* \* \* \* \* \*

Waters where a Coast Guard-certified marine sanitation device permitting discharge is allowed include coastal waters and estuaries, the Great Lakes and interconnected waterways, fresh water lakes and impoundments accessible through locks, and other flowing waters that are navigable interstate by vessels subject to this regulation." 40 C.F.R. § 140.3(a)(1) and (a)(2).

The EPA has classified Lake Hartwell as a treated discharge zone, apparently by reason of the fact that Lake Hartwell lies interstate and is navigated by vessels subject to 33 C.F.R. § 159, which prescribes minimum standards for marine sanitation devices consistent with the regulations promulgated by the EPA under the Federal Water Pollution Control Act, 33 U.S.C.A. § 1322. (*See,* Government's Exhibit 5). This means that chemically treated effluent such as that discharged by the vessels berthed at Dock "F" is permitted to flow into Lake Hartwell. The court notes that local and municipal discharge facilities around Lake Hartwell are permitted to discharge treated effluent into the lake subject to administration and inspection by the South Carolina Department of Health and Environmental Control, the Georgia Department of Natural Resources, and the EPA. (*See,* Lakeshore Management Plan, Appendix F, para. 39).

▆ An agency's interpretation of its own regulation is entitled to great deference, and where an agency's interpretation of its regulations is reasonable, that interpretation must stand even though it may not appear as reasonable as some other interpretation. *Homan & Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir. 1980). *Accord, Pennzoil Co. v. Federal Energy Regulation Commission,* 645 F.2d 360 (5th Cir. 1981). Although plaintiff's argument that Lake Hartwell is not encompassed by EPA regulation 40 C.F.R. § 140.3(a) is reasonable, the court cannot say that the EPA's classification of Lake Hartwell as a treated discharge zone under that regulation is unreasonable or an abuse of discretion. Further, it is entirely reasonable for the Corps of Engineers to follow the EPA's classification of Lake Hartwell in applying the Corps' own regulations regarding discharge of sewerage. For these reasons, the court finds that plaintiff is not entitled to an injunction prohibiting discharge of treated effluent from the boats berthed at Dock "F."

▆ Plaintiff also contends that the Corps of Engineers has allowed the owners of Dock "F" to dispose of garbage or trash into the lake and on the shoreline around Dock "F" and plaintiff's property, in violation of 33 C.F.R. §§ 327.3(i) and 327.9. However, annual and quarterly inspections in 1979 and 1980 and informal monthly cruises of the water and shoreline around Dock "F" revealed no such dumping of trash in the water or on the shoreline. (*See,* Government Exhibits 10 and 11; Deposition of James H. Huggins). Although plaintiff testified that she has removed trash and garbage from the water or shoreline abutting her property, there is no proof that the owners or users of Dock "F" were necessarily responsible for this trash. For these reasons, the court cannot find that the Corps of Engineers regulations with respect to disposal of trash in Lake Hartwell have been violated in connection with the use of Dock "F."

### V. *Public or Private Dock?*

▆ Based upon the above-stated findings of fact relative to the planning, financing, construction, maintenance, and operation of Dock "F," the court finds that Dock "F" is not a public commercial concession dock as contemplated by the lease between Harbor Light Marina and the United States but, rather, is in all essential respects a private dock similar to the private commu-

nity docks in areas of Lake Hartwell designated limited development areas. Although Warren Moore participated in the planning and financing of Dock "F," he did so individually and not as a representative of Harbor Light Marina. Harbor Light Marina was merely used as a conduit to obtain approval of Dock "F" by the Corps of Engineers, and only as a matter of form does it have any supervision or control of Dock "F." The sale of Dock "F" to the eleven individual defendants is of an indefinite duration. The public has no access to Dock "F," and no public facilities or other services usually provided by a marina are provided to Dock "F." In sum, it is beyond reasonable argument to contend that Dock "F" is in any respect a public dock.

■ Having determined that Dock "F" is essentially a private dock, the question for determination is whether approval of the construction, placement, and operation of Dock "F" as a private dock in its present location was arbitrary, capricious, or an abuse of discretion on the part of the Corps of Engineers. Administrative Procedure Act, § 10(e) (5 U.S.C.A. § 706(2)). The Chief of the Corps of Engineers is authorized under 16 U.S.C.A. § 460d to construct, maintain, and operate public recreational facilities at water resource development projects such as Lake Hartwell. Section 460d further provides:

"The Secretary of the Army is also authorized to grant leases of lands, including structures or facilities thereon, at water resource development projects for such periods, and upon such terms and for such purposes as he may deem reasonable in the public interest . . . . The water areas of all such projects shall be open to public use generally for boating, swimming, bathing, fishing, and other recreational purposes, and ready access to and exit from such areas along the shores of such projects shall be maintained for general public use, when such use is determined by the Secretary of the Army not to be contrary to the public interest, all under such rules and regulations as the Secretary of the Army may deem necessary . . . ."

The regulations at 36 C.F.R. § 327.30 deal with lakeshore management at government owned lakes such as Lake Hartwell. 36 C.F.R. § 327.30(d)(1) provides in pertinent part:

"Policy. (1) It is the policy of the Chief of Engineers to manage and protect the shorelines of all lakes under its jurisdiction to . . . promote the safe and healthful use of these shorelines for recreational purposes by all of the American people. . . . It is the objective of the Corps to manage private exclusive use of public property to the degree necessary to gain maximum benefits to the general public. Such action will consider all forms of benefits such as: recreation, esthetics and fish and wildlife."

The shoreline where Harbor Light Marina, Dock "F," and plaintiff's property are located is designated a "Public Recreation Area" under the Lakeshore Management Plan for Lake Hartwell. The regulations at 36 C.F.R. § 327.30(e)(4)(ii) and the Lakeshore Management Plan provide:

"*Public Recreation Areas.* On shorelines within or proximate to designated or developed recreation areas, *private floating recreation facilities are not permitted.* The extent of the term, proximate, will depend on the terrain, road system and similar factors. Commercial concessionaire facilities are permitted in these areas. An adequate buffer area within this allocation type will be established to protect the concession operation from invasion by private exclusive use facilities. Modification of land form or vegetative characteristics is not permitted by individuals in these areas." (emphasis added).

Appendix "F" to the Lakeshore Management Plan further provides with respect to Public Recreation Areas:

"In general, this zoning includes publicly-owned land along the shoreline where private use and facilities are prohibited. We desire to prevent conflict of private use with general public use."

It is clear from these provisions that the ownership and utilization of a private dock in a public recreation area is a *per se* violation of the applicable regulations governing management of Lake Hartwell by the Corps of Engineers and of the Lake Hartwell Lakeshore Management Plan. Dock "F" being in every essential respect a private dock owned, operated, and maintained by the eleven individual defendants, the Corps of Engineers had no discretion to allow its location and operation in the public recreation area leased to Harbor Light Marina.

In order to remain in operation as a viable business and to continue to benefit the general public in its use of Lake Hartwell, Harbor Light Marina must, of course, operate at a reasonable and long-term profit. As stated earlier, Harbor Light Marina received a total profit of $1,460 from the sale of Dock "F," and the United States received $624 in rental income as a result of the sale. Both Harbor Light Marina and the United States would receive substantially more income had Dock "F" been rented as other docks in Harbor Light Marina rather than sold to the individual defendants. The sale of Dock "F" covered the years 1979 until 1995, and beyond that time indefinitely as long as the commercial concession lease to Harbor Light Marina was renewed. Computing the rental rate for the eleven slips in Dock "F" at the 1978 annual dockage fee of $554/slip[2] for the sixteen years between 1979 and 1995, Harbor Light Marina would receive a total of $97,504 from the rental of Dock "F." Warren Moore testified in his deposition that despite receiving less gross income from the sale versus rental of Dock "F," Harbor Light Marina received approximately the same amount of profit since the costs of insurance, taxes, repair, utilities, etc., which he claims amount to ninety-four percent of the amount received from rental, are borne by the eleven owners of Dock "F." The court questions the accuracy of Mr. Moore's estimation of the percentages attributable to each item of expense; nevertheless, taking the figure of 3% as the absolute minimum return, the profit to Harbor Light Marina from the rental of Dock "F" only for the years of 1979–1995 would be $2,925, over twice the profit from the sale of Dock "F." The amount payable to the United States from rental of Dock "F" (also using 3%) would also be $2,925, almost five times the revenue actually received by the United States from the sale of Dock "F." Thus, as a result of the Corps of Engineers approval of the sale of Dock "F" on a condominium basis, both Harbor Light Marina and the United States have received substantially less income from the sale of Dock "F" to the eleven individual defendants than would be received if Dock "F" were operated on a rental basis as other docks in the marina are operated. More importantly, a private dock has been constructed in what is supposed to be an area to which the general public has access.

The Corps of Engineers' purported reasons for approving Dock "F" were: (1) Harbor Light Marina itself could not finance construction of another dock; (2) it would allow the eleven individual defendants to own dock space at Lake Hartwell; (3) it would reduce the proliferation of individually-owned docks; (4) it would benefit the public by opening up additional slips in the main marina complex. The Corps of Engineers in enacting the regulations at 36 C.F.R. § 327.30 concluded that the ownership and operation of a private dock in an area exclusively reserved for public recreation is not in the public interest. None of the reasons asserted by the Corps of Engineers justify approval of a private dock in derogation of those regulations. To say that Dock "F" is in the "public interest" because it allows the eleven individual defendants to own rather than rent dock space at Lake Hartwell is taking a very restricted view of the term "public interest." The individual defendants could just as easily have purchased a lot in a limited development area and obtained permission from the Corps to construct a community-type dock. Construction of public commercial docks in marinas such as Harbor Light

2. It can be assumed that these rates have increased since 1978.

reduce the proliferation of individually-owned docks in the same manner as does construction of private community docks. All of the individual defendants rented dock space at Harbor Light Marina, and it is doubtful that they would have built private docks somewhere on Lake Hartwell had Dock "F" not been approved by the Corps of Engineers. With regard to the fact that construction of Dock. "F" opened up the slips then being used by the individual defendants in the main marina complex, there has been no showing that public demand for boat slips at Harbor Light Marina necessitated the construction of another dock; if it did Harbor Light would have satisfied the demand. Additional boats could have been accommodated by simply building additions to existing docks. Furthermore, were Dock "F" to pass muster in this case, the Corps of Engineers would likely permit additional privately-owned condominium-type docks in the area leased to Harbor Light Marina and elsewhere on Lake Hartwell based upon the same reasons given for the approval of Dock "F." In that event, Harbor Light Marina soon would consist of a number of privately-owned docks, the current public boat slips would go unrented, and Harbor Light Marina would not be receiving a steady income necessary for it to remain a viable business serving the needs of the boating public.

For all of the above reasons, the court holds that permitting the construction and operation of Dock "F" as a private dock in the public recreation area leased to Harbor Light Marina was an abuse of discretion on the part of the Corps of Engineers which must be remedied in some manner by this court.

## VI. *Relief*

■ Plaintiff prays that the court issue an injunction requiring the removal of Dock "F" from its present location, enjoining the defendants from placing another dock in the vicinity of her property in the future, requiring the Corps of Engineers to terminate the commercial concession lease to Harbor Light Marina within the confines of the cove where plaintiff's house is located, and enjoining the use of Lot "C" as a parking lot. The basis for injunctive relief in the federal courts has always been inadequacy of legal remedies and irreparable harm, which means a substantial and material injury. Further, a mandatory injunction requiring defendant to do some positive act, rather than simply prohibitory equity relief, ordinarily should be granted only when compelling circumstances are present. *See, Citizens Concerned, Etc. v. City and County of Denver*, 628 F.2d 1289, 1297 (10th Cir. 1980).

■ Plaintiff claims that the location of Dock "F" harms her both monetarily by decreasing the value of her property and personally by interfering with and obstructing her view of Lake Hartwell. A real estate appraiser testified that the location of Dock "F" has reduced the fair market value of plaintiff's property by some $7,000. Plaintiff contends that this diminution in the value of her property constitutes a taking without due process of law in violation of the Fifth Amendment, which can be remedied only by requiring removal of Dock "F." Plaintiff may or may not have been given notice of the commercial concession lease to Harbor Light Marina at the time Harbor Light Marina was required to remove the dock utilized for a time by plaintiff subsequent to purchasing her home. Although plaintiff may not have had actual notice of the Lakeshore Management Plan, development of the plan was made public for several years and plaintiff had the same opportunity to participate in formulation of the Plan as did other landowners on Lake Hartwell. Further, plaintiff had no right to be consulted as to the placement of Dock "F," as the terms of the commercial concession lease gave Harbor Light Marina the contractual right to place a dock anywhere in the area covered by the lease. However, even if plaintiff can prove a compensable taking of her property, plaintiff would have a cause of action for inverse condemnation for which 28 U.S.C.A. § 1346(a)(2) affords an adequate remedy in damages. *See generally, United States v. 101.88 Acres of Land, Etc.*, 616 F.2d 762 (5th Cir. 1980);

*Buffalo River Conservation v. National Park*, 558 F.2d 1342 (8th Cir. 1977), *cert. den.*, 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). Plaintiff has not sought monetary damages under § 1346(a)(2), nor are such damages awardable in this action under the Administrative Procedure Act. *See, Canadian Transport Co. v. United States*, 430 F.Supp. 1168, 1170 (D.D.C.1977); *Armstrong and Armstrong, Inc. v. United States*, 356 F.Supp. 514 (D.C.Wash.1973), *aff'd*, 514 F.2d 402 (9th Cir. 1975).

In most cases the determination whether to issue an injunction involves a balancing of the equities and the interests of the parties who might be affected by the court's decision, that is, the hardship on the plaintiff if relief is denied as opposed to the hardship to the defendants if injunctive relief is granted. *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 193, 98 S.Ct. 2279, 2301, 57 L.Ed.2d 117, 146, *citing, Hecht Co. v. Bowles*, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754 (1944). *See generally*, 11 Wright and Miller, Federal Practice and Procedure, § 2942, at p. 366 (1973). Since plaintiff has an adequate remedy in damages for diminution in the value of her property, the remaining harm to plaintiff is the interference with her view of the lake. However, even considering the diminution in value of her property, it is the court's opinion that the hardships to defendants caused by requiring the removal of Dock "F" to another location on balance outweigh the hardships to plaintiff caused by the present location of Dock "F" in the vicinity of her property. Dock "F" is not located immediately adjacent to plaintiff's property and does not directly interfere with plaintiff's use or enjoyment of her property. There was testimony that the cost to defendants of relocating Dock "F" and constructing new electrical connections, etc. could run as high as $7,500. To require the Corps of Engineers to finance the relocation of Dock "F" would result in a substantial and probably unnecessary expenditure of public funds. On the other hand, if defendant Harbor Light Marina, Inc. were required to bear the cost of relocating Dock "F," it would aggravate Harbor Light's already poor financial condi-

tion and conceivably necessitate a reduction of services provided by Harbor Light. Further, the present location of Dock "F" affords the best available protection against wind and rough water.

The equities in this case weigh heavily in favor of defendants. First, as stated hereinabove, the commercial concession lease gives Harbor Light Marina the right upon approval of the Corps of Engineers to place a public commercial dock anywhere in the area included under the lease. Dock "F" could have been constructed as a public facility in its present location. The violation in this case lies in the fact that Dock "F" is owned and operated as a private dock. If that violation is enjoined and Dock "F" required to be actually owned and operated by Harbor Light Marina as a commercial dock as contemplated by the commercial concession lease, there would no longer be any basis for requiring removal of Dock "F" from its present location. Even if Dock "F" were ordered removed, unless the court ordered termination of the lease in that area, Harbor Light Marina or a future commercial concessionaire, under the terms of the lease and upon approval by the Corps, could construct another dock in the present location of Dock "F," as long as that dock was operated as a legitimate public commercial dock.

Second, there is no evidence whatsoever of any conspiracy between Harbor Light Marina, Inc., the Corps of Engineers, and the individual defendants to violate applicable regulations by maintaining Dock "F" as a private dock. The individual defendants are essentially innocent parties who relied in good faith on the representations of Warren Moore and the Corps of Engineers that ownership and operation of Dock "F" as a condominium-type dock was proper. The individual defendants spent large sums of money in reliance upon the Corps' approval of the project. Further, although plaintiff did not sleep on her rights as far as getting to the courthouse, she did not communicate to the individual defendants her objections to Dock "F" or threaten to sue at such time and in such a manner as might have led

these defendants to delay final completion of the dock. Under these circumstances, it would be unfair to unnecessarily penalize the individual defendants by requiring the relocation of Dock "F." The court recognizes that Dock "F" might never have been constructed and operated in its present manner had the Corps of Engineers enforced the terms of the lease and properly refused to approve Dock "F" on a condominium arrangement. However, for all of the above reasons, the court, upon balancing the equities and the hardships in this case, finds that an injunction requiring relocation of Dock "F" would be neither justified nor practical.

Plaintiff also seeks an injunction requiring defendant Corps of Engineers to terminate the commercial concession lease to Harbor Light Marina in the confines of the cove where plaintiff's property is located. The lease provides that the government may revoke the lease if Harbor Light Marina violates its terms and conditions. The Corps of Engineers in violation of its own regulations having approved of Dock "F," hardly possesses reasonable grounds to terminate a portion of the lease on grounds that Dock "F" constitutes a violation of the lease. Further, termination of that portion of the lease is beyond the proper authority of the court in this case.

Finally, plaintiff seeks an injunction requiring that Lot "C" be used only for residential use. Lot "C" has at all times relevant to this action been private property not subject in any way to the management or regulation of the Corps of Engineers. The court has found that no covenant exists restricting Lot "C" to residential use. Accordingly, there is no basis on which this court may limit use of Lot "C" in any manner desired by the owners. However, the Corps of Engineers having no authority to permit construction of private parking places on public shoreline, the court must require that any overlap of parking spaces from Lot "C" onto adjacent public land be removed.

## VII. *Remedy*

This court sitting as a court of equity has broad power to fashion an appropriate remedy to deal with this factual situation. The appropriate and just remedy in this case is to require that Dock "F" be sold to Harbor Light Marina and then be owned and operated by Harbor Light Marina as a public commercial dock as contemplated by the commercial concession lease and on the same basis as all of its other rental docks. Accordingly, defendants are hereby enjoined from continuing to maintain Dock "F" as a private facility and from permitting Dock "F" to be maintained under the present conditions. IT IS HEREBY ORDERED that defendant United States through the Corps of Engineers strictly enforce the applicable regulations, the Lakeshore Management Plan, and the provisions of the commercial concession lease between the United States and Harbor Light Marina, Inc., and require Harbor Light Marina to repurchase Dock "F" from the eleven individual defendants and henceforth operate Dock "F" as a public commercial dock in the same manner as other docks in Harbor Light Marina. This means that Harbor Light Marina shall rent the slips in Dock "F" to the public at the regular rental rates, shall be responsible for maintenance and repair of Dock "F," shall provide necessary public parking areas as near as possible to Dock "F" on property owned by Harbor Light Marina, Inc. or a related entity, and shall, to the extent reasonably possible, provide public facilities and security for Dock "F." As an alternative to actually repurchasing Dock "F," Harbor Light Marina may permit any or all of the eleven individual defendants who now use Dock "F" to continue to occupy their present slips in Dock "F" on a rental basis, and credit these individuals for rent in the amount already actually paid by them for construction of Dock "F." The Corps of Engineers is further directed to require the removal of any parking spaces located on public shoreline.

The United States through the Corps of Engineers shall be ultimately responsible for implementing this order. The Assistant United States Attorney shall file a written

report with this court on or before January 15, 1981, setting out in detail the manner in which this order has been carried out. If by that date Dock "F" is not being owned and operated by Harbor Light Marina as required by this order, the court shall order the United States at its expense to cause the removal of Dock "F" from its present location.

## VIII. *Attorneys Fees*

■ Plaintiff prays that she be awarded her attorneys fees in the amount of $20,-829.00 and costs of $1,759.78 against defendants United States and Harbor Light Marina, Inc. Plaintiff being a prevailing party in this case is entitled to recover her costs. Costs may be awarded against the United States under 28 U.S.C.A. § 2412, which provides in pertinent part:

"Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title but not including the fees and expenses of attorneys may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or official of the United States acting in his official capacity, in any court having jurisdiction of such action."

The United States through the Corps of Engineers, being the defendant ultimately responsible for permitting the ownership and operation of Dock "F" as a private dock in the public recreation area leased to Harbor Light Marina, should bear the burden of paying the total amount of plaintiff's costs.

Plaintiff seeks an award of attorneys fees against the United States and Harbor Light Marina, Inc. under 42 U.S.C.A. § 1988 for vindication of federal civil rights and on grounds that these defendants are guilty of bad faith and unreasonable, wanton, and oppressive conduct in precipitating and defending this lawsuit. The "Equal Access to Justice Act," 28 U.S.C.A. § 2412, as amended Oct. 21, 1980, Pub.L. 96–481, § 204(a), became effective as law on October 1, 1981, and is applicable to this case which remained "pending" on that date. That act substantially changed existing law by providing that the United States or any agency of the United States may be liable for a prevailing party's attorneys fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C.A. § 2412(b). Under this act, then, a United States agency presumably may be liable for attorneys fees under 42 U.S.C.A. § 1988 or under the bad faith theory asserted by plaintiff here.

■ After a careful consideration of the facts in this case, the court concludes that plaintiff is not entitled to an award of attorneys fees either under § 1988 or under the theory that defendants acted unreasonably and in bad faith in defending against plaintiff's claims. Section 1988, as amended, provides in pertinent part: "In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985, 1986 of this title .... the court, in its discretion, may award the prevailing party a reasonable attorney's fee ...." Plaintiff never sought to assert a claim in this case under any of these sections, and is therefore not entitled to utilize § 1988 to obtain an award of attorneys fees.

■ The court has considered substantial authority on the question of awards of attorneys fees against an unsuccessful party who has acted in bad faith, unreasonably, or vexatiously. *See, Alyeska Pipeline Service v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Hall v. Cole*, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973); *Fairley v. Patterson*, 493 F.2d 598 (5th Cir. 1974); *United States v. Standard Oil of California*, 603 F.2d 100 (9th Cir. 1979); *National Association of Letter Carriers v. U. S. Postal Service*, 590 F.2d 1171 (D.C.Cir.1978); *Wright v. Heizer Corp.*, 503 F.Supp. 802 (N.D.Ill.1980), Annot., 31 A.L.R. Fed. 833 (1977). In particular the court notes the warning of Professor Moore that an award of attorneys fees may be justified on this basis "only in exceptional cases and for dominating reasons of justice." 6 Moore's Federal Practice, Para. 54.77[2] (2nd ed. 1976). The court also notes 28 U.S.C.A. § 2412(d)(1)(A), which

provides that in an action against the United States, a prevailing party shall be awarded attorneys fees unless the position of the United States was substantially justified or that special circumstances make an award unjust. An award of attorneys fees against the Corps of Engineers or Harbor Light Marina, Inc. would not be justified under the facts of this case. The position of these defendants with respect to plaintiff's claims regarding restrictive covenants and discharge of sewerage were substantially justified in law and fact. Although the Corps of Engineers was obstinate in refusing to concede that Dock "F" is in all essential respects a private dock improperly located in a public recreation area, the Corps of Engineers did have reasons for approving Dock "F" and did in good faith and on clearly reasonable grounds oppose removal of Dock "F" to another location. The primary objective of plaintiff in this case being the removal of Dock "F" from the vicinity of her property, the court seriously doubts that a concession by the Corps of Engineers that Dock "F" is a private dock, and a willingness on the Corps' part to make it public, would have prevented plaintiff from expending her time, effort, and money in bringing this lawsuit. For these reasons, the court finds that these defendants did not act unreasonably or in bad faith so as to justify an award of attorneys fees.

An additional reason exists in this case for denying an award of attorneys fees against the United States. 28 U.S.C.A. § 2412(a) provides that a court may decline to award attorneys fees if "special circumstances" make an award unjust. This case was tried on January 12, 1981, and was ready to be decided as of February 23, 1981. For a number of reasons, the court was obviously substantially delayed in entering a decision in this case. However, the majority of this opinion was prepared prior to October 1, 1981, the effective date of amended section 2412. Had this court entered this decision in a timely manner, plaintiff would not have been entitled to an award of attorneys fees against the United States. Former section 2412 (cited above at p. 1008) expressly immunized the United States against awards of attorneys fees absent express statutory authority to the contrary. *See, Alyeska Pipeline Service Co. v. Wilderness Society, supra,* 421 U.S. at 264 n. 39, 267–68, 95 S.Ct. at 1625 n. 39, 1626; *Donovan v. Nichols,* 646 F.2d 190 (5th Cir. 1981). Further, this section 2412 ban on fee awards against the United States admitted of no "bad faith" exception. *Id.* at 192. Plaintiff would also not be able to recover attorneys fees against the United States under section 1988 because that statute does not provide for an attorneys fee award against the United States. *Shannon v. United States Dept. of Housing and Urban Development,* 577 F.2d 854 (3rd Cir. 1978). Since the United States would not have been liable for plaintiff's attorneys fees had a timely decision been entered, the court believes that it would be unjust to now award plaintiff attorneys fees under amended section 2412 which did not become effective until this opinion had already in large part been drafted by the court, but not yet entered.

Accordingly, the court declines to award plaintiff attorneys fees. Defendant United States is ordered to pay plaintiff her costs in the amount of $1,759.78.